

CLERK'S OFFICE
A TRUE COPY
Nov 30, 2021
s/ Michael Longley
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| Records and information associated with the Apple, Inc. / iCloud account belonging to Marisela.Obregon@icloud.com, further described in Attachment B | ) |
| | ) |
| | ) |

Case No. **21-M-540-SCD**

**Matter No.: 2021R00403**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841, 846 and 856 | Distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances and maintaining a drug-involved premises. |

The application is based on these facts:

See the attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF SA Alexander Erlien
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: **11-30-21**

_____
*Judge's signature*

City and state: *Milwaukee, Wis*

Hon. Stephen C. Dries. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT
## MATTER NUMBER 2021R403

I, Alexander Erlien, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

## I.  INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with Apple iCloud account associated with the following information, and further described in Attachment A, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA:

> **Account 1:**
> Name: Marisela Obregon
> Date of Birth: 06/13/1993
> Phone: 414-690-4086
> Addresses:       3123 S Brisbane Ave, Milwaukee, WI 53207
>                  3216 N Humboldt Blvd, Milwaukee, WI 53212
>                  1437 S 71st Street, West Allis, WI 53214
> Email: [MARISELA.OBREGON@ICLOUD.COM](mailto:MARISELA.OBREGON@ICLOUD.COM)

2.      The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

3.      I have been a SA with the ATF since September 26, 2018. I was previously employed as Police Officer for the City of Janesville, Wisconsin for approximately five and a half years, and prior to that, I was an Officer in the United States Navy for approximately five years. I have a bachelor's degree in philosophy from the University of Wisconsin – Madison. I have been involved in numerous investigations involving violations of firearms laws, drug

trafficking, human trafficking, and drug possession, resulting in the arrest of numerous criminal defendants and the seizure of illegal firearms and illicit controlled substances.

4.     I have received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I have been trained regarding these offenses and has arrested individuals for federal firearms related offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 21, United States Code, Sections 841, 846, and 856. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

5.     I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

6.     I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics

2

trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

7.     SA ███████████ with the ATF performed various investigative tasks in this matter, including several undercover operations.  SA ██████ is employed as a special agent with the ATF and has been since October 2018. SA ██████ received extensive training at the Federal Law Enforcement Training Center in Glynco, GA.  SA ██████ attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. SA ██████ has received training in the investigation of violations of firearms laws, drug trafficking, and drug possession. SA ██████ has gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.  Prior to becoming a special agent with the ATF, SA ██████ received a bachelor's degrees from the University of Wisconsin – Eau Claire in the field of Criminal Justice.  I have discussed and participated this investigation with SA ██████

8.     Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

9.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of distribution and possession with intent

3

to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances and maintaining a drug-involved premises, violations of Title 21, United States Code, Sections 841, 846 and 856 and possession of a firearm in furtherance of drug trafficking, violation of Title 18, United States Code Sections 924(c), have been committed by Alex WEDDLE, Carlos PEREZ-RAMIREZ, Janicia MACK-HOWARD, Anthony HENRY, **Marisela OBREGON**, and other unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## II. JURISDICTION

11.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## III. PROBABLE CAUSE

### A. DEBRIEF OF CONFIDENTIAL SOURCES

12.     Beginning in August 2021, ATF Special Agents (SAs) and Officers from the Milwaukee Police Department (MPD), hereinafter referred to as "Investigators," began investigating an armed drug trafficking organization operating in the Eastern District of Wisconsin (WI).

13.     On August 23, 2021, SA ███████ along with MPD Officers Evan Dominie and Ndiva Malafa met with ATF confidential informant (CI) #1. During the debrief of CI #1, CI #1 stated he/she had information regarding an individual known to CI #1 as "A1." Please note, Investigators know from knowledge gleaned over the course of other law enforcement activities

4

and investigations that Alex WEDDLE, utilizes the nickname "A1." CI #1 stated he/she had known "A1" for several years and has known "A1" to sell narcotics during the entirety of their relationship.

14. CI #1 explained that "A1" sells both crack cocaine and powder cocaine in the Milwaukee, WI, area. CI #1 stated "A1" sells various quantities of crack cocaine ranging from grams to ounces. CI #1 also stated that when "A1" sells narcotics, "A1" keeps a handgun on his ("A1's") person. CI #1 stated he/she has known "A1" to bring a young "Puerto Rican" male with him ("A1") to act as armed security while "A1" sells narcotics.

15. The CI #1 stated he/she last spoke with "A1" within the last seven days. CI #1 provided telephone numbers 414-644-6249 and 414-722-0553 as numbers being actively utilized by "A1."

16. Officer Malafa obtained a photograph of WEDDLE and displayed the photograph to CI #1. CI #1 immediately identified WEDDLE as the individual CI #1 knew as "A1."

17. CI #1's information is credible and reliable because CI #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation including through controlled drug buys, queries of law enforcement databases, and surveillance. CI No. 1 has two felony convictions from April 2014, for possession of narcotic drugs and possess with intent to deliver prescriptions. CI #1 is cooperating with law enforcement in exchange for monetary compensation. CI #1 has no arrests or convictions relating to dishonesty.

18. At the direction of SA ███ CI #1 then placed an outgoing call to WEDDLE; however, there was no answer.

19. After the debrief of CI #1, SA ███ spoke to Officer Malafa and Officer

5

Domine about the intelligence MPD had obtained for WEDDLE over the past several years. Officer Malafa stated WEDDLE is known to MPD as an armed drug dealer in Milwaukee, WI. Officer Malafa stated WEDDLE is known by MPD to reside on the east side of Milwaukee and utilizes several different residences to cook, store, and sell crack cocaine. Officer Malafa also stated WEDDLE has been known to utilize rental vehicles to sell narcotics. I know through knowledge, training, and experience that individuals engaged in the sale of narcotics commonly utilize vehicles not registered to the seller (i.e. rental cars) to sell narcotics to avoid detection of the seller's true identity by law enforcement.

20.     On August 25, 2021, Investigators met with a CI #2, who stated they have known "A1" for approximately three years. CI #2 stated he/she has known "A1" to be engaged in the sale of ounce quantities crack cocaine in the Milwaukee, WI, area. CI #2 stated when "A1" is engaged in the sale of narcotics, "A1" keeps a handgun on his person. CI #2 stated most recently, he/she met with "A1" in a vehicle and observed a pistol in between "A1's" legs. CI #2 stated WEDDLE resides on the east side of Milwaukee; however, WEDDLE utilizes several different residences to cook, store, and sell narcotics.

21.     CI #2 stated "A1" possesses numerous telephone numbers, but most recently "A1" has utilized telephone number 414-722-0553. This is the same telephone number provided to Investigators by CI #1.

22.     CI #2's information is credible and reliable because CI #2 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation including through controlled drug buys, queries of law enforcement databases, and surveillance. CI #2 has no felony convictions but does have multiple misdemeanor convictions including possession of cocaine, resisting or obstructing an officer, and

6

disorderly conduct, domestic abuse. CI #2 has no arrests or convictions relating to dishonesty. CI #2 is cooperating with law enforcement in exchange for monetary compensation.

23.     On August 25, 2021, Investigators queried "Alex WEDDLE" via National Criminal Information Center (NCIC). NCIC identified the following criminal arrests for WEDDLE:

   a. November 16, 2000 arrest by MPD for first degree sexual assault of child;
   b. December 11, 2011 arrest by MPD for resisting/obstructing an officer;
   c. March 10, 2012 arrest by MPD for robbery with threat of force;
   d. October 6, 2017 arrest by MPD for operating a vehicle without consent;
   e. October 13, 2017 arrest by MPD for resisting/obstructing an officer;
   f. January 24, 2021 arrest by Muskego Police Department for possession of cocaine/coca; and
   g. October 25, 2021 arrest by Milwaukee County Sheriff's Department for felon in possession of a firearm and disorderly conduct.

24.     A query of WEDDLE's criminal history also identified WEDDLE was convicted on December 3, 2008 for burglary of a building or dwelling, party to a crime, a class F felony, in Milwaukee County Case 2008CF4606.

25.     Additionally, on July 29, 2021, an arrest warrant was issued for WEDDLE out of Waukesha County related to WEDDLE's failure to appear for Waukesha County Case No. 2021CM001240 (Possession of Cocaine/Coca).

26.     On August 24, 2021, at approximately 5:50 P.M., at the direction of Investigators, CI #1 made a recorded call to WEDDLE at telephone No. 414-722-0553. During the call, the CI #1 informed WEDDLE that CI #1 had an associate that was looking to purchase narcotics. WEDDLE responded, "Call me I got you."

**B. FIRST UNDERCOVER TRANSACTION WITH 414-722-0553 – SEPTEMBER 1, 2021**

27.     On September 1, 2021, at approximately 9:26 A.M., at the direction of

Investigators, CI #1 texted WEDDLE to inform WEDDLE that CI #1's associate, SA ███ working undercover, wanted to purchase a "ball" later that day. Please note, I know from knowledge, training, and experience that "ball" is commonly used in street vernacular when referring to 3.5 grams of narcotics.

28.     At approximately 10:40 A.M., at the direction of Investigators, CI #1 contacted WEDDLE via telephone number 414-722-0553 and informed WEDDLE CI #1's associate, SA ███ wanted to purchase approximately 3.5 grams of crack cocaine from WEDDLE. CI #1 also informed WEDDLE that CI #1's associate, SA ███ would be ready to meet WEDDLE at approximately 2:00 P.M. WEDDLE responded, "I'm waiting on your call."

29.     At approximately 2:45 P.M., Investigators met with CI #1 at a staging location. At this time CI#1 was searched for contraband, of which none was found. Additionally, CI #1 was provided with audio-/videorecording/transmitting devices. SA ███ was equipped with audio-/videorecording/transmitting devices and an amount of pre-recorded ATF buy money.

30.     At approximately 2:51 P.M., WEDDLE texted CI #1, "Waiting on your call."

31.     At approximately 2:54 P.M., at the direction of ATF SAs, CI #1 called WEDDLE and asked WEDDLE to meet undercover SA ███ at Walmart that was located at 401 E. Capitol Drive, Milwaukee, WI in approximately 20 minutes. WEDDLE responded, "That's perfect."

32.     At approximately 3:05 P.M., SA ███ initiated the audio-/videorecording/transmitting equipment. At approximately 3:08 P.M., CI #1 and SA ███ departed the staging location and traveled towards Walmart in an undercover vehicle (UCV). Please note, during the operation, the undercover Investigators were followed by a designated cover team.

8

33.     At approximately 3:18 P.M., at the direction of Investigators, CI #1 called WEDDLE and informed WEDDLE that his associate, undercover SA ▮▮▮ would soon be arriving at Walmart. WEDDLE informed CI#1 that WEDDLE would be arriving in "four minutes."

34.     At approximately 3:20 P.M., SA ▮▮▮ and CI #1 arrived at Walmart and parked in the northeast corner of the parking lot. At approximately 3:27 P.M., CI #1 called WEDDLE and informed WEDDLE that CI #1 was waiting for WEDDLE at Walmart. WEDDLE informed CI #1 that WEDDLE was approximately "two minutes" away from Walmart. WEDDLE then asked CI#1 to meet WEDDLE at the "Gamestop on Richards." Please note, the Gamestop store referenced by WEDDLE was across the street from Walmart.

35.     After the call was ended, CI #1 and SA ▮▮▮ drove across the street and parked in the Gamestop parking lot.

36.     At approximately 3:36 P.M., WEDDLE texted CI #1 to inform CI #1 that WEDDLE was "pulling up" and would be in a "red Altima."

37.     At approximately 3:41 P.M., SA ▮▮▮ observed a red, four-door Nissan Altima, bearing WI license plate "AHS3102" enter the Gamestop parking lot from Richards Street. As the red Altima approached CI #1 and SA ▮▮▮ SA ▮▮▮ observed the vehicle was occupied by three black males. The red Altima then parked in front of SA ▮▮▮ and CI #1, who were standing outside the UCV. SA ▮▮▮ and CI #1 then walked up to the red Altima and SA ▮▮▮ entered the car and sat in the rear driver-side seat. Please note, CI #1 did not enter WEDDLE's vehicle at any time.

38.     Upon entering the vehicle, SA ▮▮▮ immediately identified the individual in the rear-passenger side seat as WEDDLE. Please note, SA ▮▮▮ identified the individual as

9

WEDDLE from having previously examined WI Department of Transportation (DOT) photographs of WEDDLE.

39.     Additionally, SA ███ smelled an odor of burnt marijuana and observed the front-seat passenger was smoking a suspected marijuana blunt (Figure 1). SA ███ then exchanged greetings with the vehicle's occupants and observed WEDDLE had an iPhone placed in the rear-middle seat as he spoke with an unknown female on speakerphone. WEDDLE then ended the call and asked SA ███ "What you wanna do, a ball (3.5 grams)?"



*(Figure 1)*
*Screenshot from the recordings of the front-passenger, later identified as Carlos PEREZ-RAMIREZ, smoking a suspected marijuana blunt.*

40.     WEDDLE then reached across SA ███ and stuck his hand inside the seat pocket behind the driver's seat. WEDDLE removed a digital scale from the seat pocket and presented a clear plastic bag containing a large amount suspected crack cocaine. WEDDLE then placed the scale on the rear-passenger door frame and began breaking off small pieces of

10

suspected crack cocaine from the larger piece within the clear plastic bag. As WEDDLE broke the smaller pieces off, WEDDLE placed them on the digital scale.

41.     At approximately 3:41 P.M., as WEDDLE weighed the suspected crack cocaine, WEDDLE handed the iPhone that was placed in the rear-middle seat to the front passenger. WEDDLE then instructed the front passenger to enter SA ▇▇▇ information into the phone when he stated, "Lil bro, take this number down, put it in the phone." SA ▇▇▇ then provided the front-seat passenger with SA ▇▇▇ cell phone number. Complying with WEDDLE's request, the front seat passenger then entered SA ▇▇▇ name and number into the phone's contacts and called SA ▇▇▇ so SA ▇▇▇ could have WEDDLE's number. Please note, immediately after the front passenger placed the outgoing call to SA ▇▇▇ SA ▇▇▇ received an incoming call from 414-722-0553.

42.     At approximately 3:42 P.M., WEDDLE handed SA ▇▇▇ two pieces of crack cocaine without packaging. SA ▇▇▇ asked WEDDLE if WEDDLE had a bag for SA ▇▇▇ to package the suspected crack cocaine. WEDDLE stated that he did not have a bag available for SA ▇▇▇ to use. SA ▇▇▇ then placed the suspected crack cocaine in his pocket and asked WEDDLE what SA ▇▇▇ owed WEDDLE for the suspected crack cocaine. WEDDLE responded, "225." SA ▇▇▇ then counted $240 of the pre-recorded funds and provided them to WEDDLE. Please note, SA ▇▇▇ paid WEDDLE more than he requested due to a lack of smaller denominations of United States Currency SA ▇▇▇ had available.

43.     WEDDLE then stated, "Make sure you call me bro. This is gonna be the best shit. I'm tellin' you. You gonna call me back and be like 'hey you da man.'" Please note, SA ▇▇▇ understood this to mean WEDDLE was informing SA ▇▇▇ that the suspected crack cocaine WEDDLE had provided to SA ▇▇▇ was high-quality.

11

44.     At approximately 3:43 P.M., SA ███ thanked WEDDLE and WEDDLE stated, "Alright call me bro." SA ███ then exited the Altima and walked back to the UCV. SA ███ then observed the Altima exit the Gamestop parking lot and drive southbound on Richards Street. Please note, after SA ███ entered the UCV, CI #1 stated the rear passenger was the individual he/she knew as "A1."

45.     At approximately 3:44 P.M., the undercover personnel departed the Gamestop parking lot in the UCV and traveled to a pre-determined location. At approximately 3:48 P.M., SA ███ terminated the audio-/videorecording/transmitting equipment. At approximately 4:05 P.M., the undercover personnel arrived at the pre-determined location and the operation was terminated. At this time, CI #1 was once again searched for contraband, of which none was found.

46.     Upon arriving at the ATF Milwaukee Field Office, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 2.54 grams (without packaging) and field-tested positive for crack cocaine.

47.     Continuing September 1, 2021, at approximately 4:31 P.M., at the direction of Investigators, CI #1 called WEDDLE at 414-722-0553 and informed WEDDLE that the suspected crack cocaine WEDDLE had given SA ███ weighed approximately one gram less than the three and one-half grams SA ███ had agreed to pay for. WEDDLE responded, "Tell him to call me and come down bro. Tell him bring his own scale. I don't think so, but tell him come on bro. I'm a businessman." The call was then ended for an unknown reason and at 4:32 P.M., CI #1 received an incoming call from WEDDLE. WEDDLE reiterated that he did not believe he had given SA ███ less than three and one-half grams. WEDDLE asked CI #1 to have SA ███ call WEDDLE and stated, "I want everyone to be satisfied dealing with me bro."

12

48.     At approximately 4:37 P.M., SA ███ received a text from WEDDLE's number 414-722-0553 asking for SA ███ to call WEDDLE.

49.     At approximately 5:21 P.M., SA ███ called WEDDLE and explained WEDDLE had sold SA ███ a full gram less than the three and one-half grams SA ███ had paid for. WEDDLE stated he did not think SA ███ was correct; however, WEDDLE invited SA ███ to "come back down" so WEDDLE could provide SA ███ with the gram of crack cocaine SA ███ had been shorted. WEDDLE stated he is a "businessman" and WEDDLE wouldn't do any "sheisty shit." Please note, in this context, SA ███ understood this to mean WEDDLE would not intentionally provide SA ███ less crack cocaine than SA ███ paid for.

50.     SA ███ and WEDDLE then agreed WEDDLE would provide the shorted, one gram, to SA ███ during the next transaction.

## C.  IDENTIFICATION OF MARISELA OBREGON AND CARLOS PEREZ-RAMIREZ

51.     On September 7, 2021, Investigators queried the red Nissan's registration information via WI Department of Transportation (DOT) records. Per WI DOT, the red Nissan Altima was registered to **Marisela OBREGON** (F/W; DOB: XX/XX/1993; Address: 3216 N Humboldt Blvd, Milwaukee, WI 53212). Per the records, the vehicle's registration was last renewed on August 20, 2021.

52.     On September 8, 2021, Investigators identified that on September 3, 2021, the red Nissan Altima utilized by WEDDLE and his associates on September 1, 2021, was in a vehicle accident in Milwaukee, WI. Investigators learned the occupants of the red Altima at the time of the accident were **OBREGON**, Carlos PEREZ-RAMIREZ, and their small child. PEREZ-RAMIREZ provided MPD officers with his telephone number 414-334-6211 and home address

13

of 3704 West Juniper Court, Milwaukee, WI.

53.    Investigators were able to review the body camera footage from the responding MPD Officers' body camera footage (Figure 2). After reviewing the footage, Investigators immediately recognized PEREZ-RAMIREZ as the unidentified male who was seated in the front-passenger seat of the red Nissan Altima during the previously mentioned narcotics transaction on September 1, 2021.



*(Figure 2)*
*Screenshot of PEREZ-RAMIREZ from MPD Officer Body Camera Footage from*
*September 3, 2021*

54.    On September 7, 2021, Investigators queried PEREZ-RAMIREZ's criminal history via National Criminal Information Center (NCIC). NCIC also identified the following arrests for PEREZ-RAMIREZ:

    a.  May 7, 2017 arrest by MPD for first degree recklessly endangering safety;

14

b. May 7, 2017 arrest by MPD for intentionally pointing a firearm at a person;
c. November 3, 2020 arrest by MPD for possession of methamphetamine;
d. July 14, 2021 arrest by MPD for diving or operating a vehicle without owners' consent; and
e. July 14, 2021 arrest by MPD for possessing amphetamine/LSD/psilocin.

55.     A query of PEREZ-RAMIREZ's criminal history also identified PEREZ-RAMIREZ was convicted on February 20, 2017 for Carrying a Concealed Weapon, a class A misdemeanor in Milwaukee County Case 2017CM577.

### D. SECOND UNDERCOVER TRANSACTION WITH 414-722-0553 – SEPTEMBER 8, 2021

56.     On September 7, 2021, at approximately 1:52 P.M., SA ████ texted WEDDLE at 414-722-0553 to inform WEDDLE that SA ████ would be in Milwaukee the following day to purchase additional amounts of crack cocaine. On the same date, SA ████ called WEDDLE at 414-722-0553. An unknown male answered SA ████ call and stated "Yo Carlito ain't around it's his big brother. What you say?" SA ████ then asked if the individual would be in Milwaukee, WI, the following day. The unknown individual responded, "Yep come on down buddy, I got you, come on down." Please note, in this context, SA ████ understood the individual speaking to SA ████ was explaining PEREZ-RAMIREZ ("Carlito") was not currently working the telephone. Investigators know through knowledge, training, and experience that individuals belonging to an armed drug trafficking organization (ADTO) commonly take turns utilizing a given cellular phone and/or telephone number. The purpose of rotating the controller of the telephone/telephone number allows the ADTO to provide around-the-clock responses to customers seeking narcotics.

57.     At approximately 11:05 A.M., at the direction of Investigators, CI #1 called WEDDLE at 414-722-0553. Upon WEDDLE answering, CI #1 asked, "Is this A1." WEDDLE

15

then responded "Yeah, whats up…" Please note, Investigators monitored the audio of the call and recognized the male's voice to be WEDDLE's. Investigators were able to identify the speaker as WEDDLE from SA █████ having previous recorded undercover contacts with WEDDLE in person and over the telephone.

58.     CI #1 then informed WEDDLE that SA █████ was seeking to purchase an amount of crack cocaine from WEDDLE later that day. WEDDLE responded, "Tell him (SA █████ to call me."

59.     On September 8, 2021, at approximately 11:43 A.M., SA █████ texted WEDDLE at 414-722-0553 to inform him that SA █████ would be available to purchase crack cocaine later that day. WEDDLE replied at 11:56 A.M., "Ok bet" and "Call when ready."

60.     At approximately 3:02 P.M., SA █████ called WEDDLE at 414-722-0553 to inform WEDDLE that SA █████ would be available to meet shortly. An unidentified male, later determined to be PEREZ-RAMIREZ, answered the phone. SA █████ asked if PEREZ-RAMIREZ would be able to meet SA █████ in approximately 20 minutes at Gamestop located at 3907 N Richards Street. The unidentified individual responded, "Yeah that's cool. Come on."

61.     At approximately 3:03 P.M., SA █████ departed the operation's staging location and traveled towards Gamestop in an undercover vehicle (UCV). Please note, SA █████ was equipped with audio-/videorecording/transmitting equipment and an amount of ATF funds. At approximately 3:17 P.M., SA █████ activated the recording equipment.

62.     At approximately 3:20 P.M., SAs █████ arrived Gamestop. At approximately 3:21 P.M., SA █████ texted 414-722-0553 that SA █████ had arrived at Gamestop. At approximately 3:26 P.M., SA █████ received a response from 414-722-0553: "Ok pulling up."

63.     At approximately 3:31 P.M., SA █████ observed a black Kia sedan bearing

16

Illinois (IL) license plate "CN95593" pull into the parking lot of Aldi, which was directly north of the UCV. The black Kia then parked in front of the UCV and honked its horn. Please note, as the Kia was in the process of parking, SA ███ identified the vehicle was being operated by PEREZ-RAMIREZ, the vehicle's sole occupant.

64.     SA ███ then exited the UCV and walked over to PEREZ-RAMIREZ's vehicle and entered the front passenger seat. Upon entering PEREZ-RAMIREZ's vehicle, SA ███ observed PEREZ-RAMIREZ (Figure 3).   PEREZ-RAMIREZ was holding a clear Ziploc bag containing a large amount of suspected crack cocaine.

65.     SA ███ then greeted PEREZ-RAMIREZ and asked if WEDDLE had informed PEREZ-RAMIREZ that WEDDLE owed SA ███ one gram of crack cocaine because the purported crack cocaine WEDDLE sold SA ███ on September 1, 2021, was approximately one gram short of the three and one-half grams SA ███ had paid for. PEREZ-RAMIREZ responded, "Nmm Nmm. He (WEDDLE) didn't tell me nothing." SA ███ then asked PEREZ-RAMIREZ to call WEDDLE so WEDDLE could confirm what SA ███ had just told PEREZ-RAMIREZ. PEREZ-RAMIREZ stated he had just tried calling WEDDLE and explained, "I just tried to call him for somebody else he didn't answer."

17



*(Figure 3)*
*Screenshot from the recordings of PEREZ-RAMIREZ seated in the driver's seat of the black Kia.*

66.    SA ▮▮▮ then asked PEREZ-RAMIREZ how much crack cocaine SA ▮▮▮ could purchase for $500. PEREZ-RAMIREZ responded, "A little more than seven." Please note, in this context, SA ▮▮▮ understood this to mean for $500, SA ▮▮▮ could purchase approximately seven grams of crack cocaine, which is approximately one-quarter of one ounce.

67.    PEREZ-RAMIREZ then placed a black digital scale on the driver-side floorboard and began weighing the purported crack cocaine (Figure 4). SA ▮▮▮ asked PEREZ-RAMIREZ if the seven grams PEREZ-RAMIREZ was weighing included the extra gram that was owed to SA ▮▮▮ by WEDDLE. PEREZ-RAMIREZ responded, "I told you he aint tell me nothin, bro, so I can't. I gotta wait for him. If he say he gonna give it to you, he gonna give it to you, just gotta wait on him… We don't do business like that."

68.    PEREZ-RAMIREZ then reiterated he was waiting for WEDDLE to call him back and PEREZ-RAMIREZ needed to speak to WEDDLE prior to giving SA ▮▮▮ the additional gram.

18



*(Figure 4)*
*Screenshot from the recordings showing PEREZ-RAMIREZ removing small pieces from the clear Ziploc bag, which he then placed on a black digital scale by his feet.*

69.     At approximately 3:33 P.M., PEREZ-RAMIREZ received an incoming video-call from PEREZ-RAMIREZ's telephone contact, "Bae." PEREZ-RAMIREZ answered the call and exchanged greetings with a female, who he verbally referred to as "Bae." Please note, when PEREZ-RAMIREZ answered the incoming video call, SA ▮▮▮▮ observed the video-caller on PEREZ-RAMIREZ's cell phone. SA ▮▮▮▮ immediately identified the caller as Marisela **OBREGON** from having previously examined WI DOT photographs of **OBREGON**.

70.     **OBREGON** and PEREZ-RAMIREZ then discussed PEREZ-RAMIREZ meeting with an insurance adjuster who would assess damage that had been done to **OBREGON's** vehicle as well as injuries PEREZ-RAMIREZ had incurred from an automobile accident. Please note, Investigators understood this conversation was in reference to **OBREGON's** vehicle accident on September 3, 2021.

19

71.     As PEREZ-RAMIREZ spoke with **OBREGON**, he picked up the digital scale, which held the crack cocaine being purchased by SA ██████ and placed it on the center console, so SA ██████ could observe the weight, approximately 6.97 grams. SA ██████ then placed his undercover digital scale on the center console and transferred the suspected crack cocaine from PEREZ-RAMIREZ's scale to his own. After transferring the substance to his scale, SA ██████ observed the weight of the suspected crack cocaine was approximately 6.95 grams. After weighing the substance, SA ██████ reached down and grabbed an empty small green bag. SA ██████ asked PEREZ-RAMIREZ if SA ██████ could use the bag to package the suspected crack cocaine, to which PEREZ-RAMIREZ agreed. SA ██████ then transferred the purported crack cocaine into the green bag.  SA ██████ then removed an amount of ATF funds from his pocket and counted $500, SA ██████ provided the $500 to PEREZ-RAMIREZ in exchange for the suspected crack cocaine.

72.     PEREZ-RAMIREZ then stated he would soon contact SA ██████ after he spoke with WEDDLE. PEREZ-RAMIREZ further explained if WEDDLE confirmed WEDDLE owed SA ██████ an additional gram of crack cocaine, PEREZ-RAMIREZ would call SA ██████ to come back to obtain the narcotics. After explaining SA ██████ needed to leave Milwaukee at that time, PEREZ-RAMIREZ stated, in substance, that he would have the additional gram of crack cocaine for SA ██████ the next time they met.

73.     At approximately 3:37 P.M., SA ██████ thanked PEREZ-RAMIREZ, exited the Kia, and walked back to the UCV. SA ██████ then observed PEREZ-RAMIREZ drive eastbound towards Richards Street until he was out of sight.

74.     Continuing September 8, 2021, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 6.95 grams without packaging and field-tested

20

positive for crack cocaine.

75.     On September 9, 2021, SA ███ spoke with Avis Budget Group in regard to the Kia that was operated by PEREZ-RAMIREZ the previous day. Per Avis, the vehicle had been rented by **OBREGON** on September 4, 2021.

76.     On September 9, 2021, at the direction of Investigators, CI #1 contacted WEDDLE at telephone No. 414-722-0553. Upon the call being connected, CI #1 asked if the individual who answered the phone was "A1," which WEDDLE subsequently confirmed. CI #1 then stated that SA ███ was upset that PEREZ-RAMIREZ did not provide SA ███ with the one gram of suspected crack cocaine that WEDDLE owed SA ███ from the narcotics transaction which occurred on September 1, 2021.

77.     WEDDLE then told CI #1, "I didn't have the phone yesterday bro, that was 'Lil Bro' workin. I didn't have the phone yesterday that was Lil Bro workin. Lil Bro didn't know nothin about that. He didn't know nothin about that." Please note, Investigators know from knowledge, training, and experience, that members of ADTOs commonly take turns, or "shifts," operating a telephone and/or telephone number used for the sale of controlled substances. After WEDDLE stated, 'Lil Bro' did not know about the previous shortage, a faint voice was heard in the background saying, "I told him (SA ███ that."

78.     CI #1 then asked WEDDLE to contact SA ███ to explain the misunderstanding. WEDDLE responded, "I got you I got you." After CI #1 finished speaking with WEDDLE, SA ███ received three calls from 414-722-0553; however, SA ███ did not answer. At approximately 4:32 P.M., SA ███ called 414-722-0553; however, there was no answer.

79.     At approximately 5:14 P.M., SA ███ received a call from WEDDLE from 414-

21

722-0553. WEDDLE stated, in substance, that SA ██████ needed to "come down" and meet with WEDDLE. SA ██████ responded that he could not meet with WEDDLE at that time. SA ██████ and WEDDLE then discussed the transaction between PEREZ-RAMIREZ and SA ██████ that occurred previous day.

80.     WEDDLE stated PEREZ-RAMIREZ did not provide SA ██████ with an additional gram because, "He (PEREZ-RAMIREZ) ain't know nothing." WEDDLE then attempted to personally take care of the shortage when he stated, "So that's why I'm telling you to come down."

81.     SA ██████ asked WEDDLE if he could provide the shorted one gram to SA ██████ during a future narcotics transaction. WEDDLE agreed and explained, "We don't do (bad) business like that man. You should already know that. You should've come down again and he'd take care of you. And he told me you put it on the scale. We don't play no games… It was just a misunderstanding." After agreeing to provide the one gram to SA ██████ during the next transaction, WEDDLE stated, "I got you, boss, call us."

82.     On September 11, 2021, at approximately 10:06 A.M., SA ██████ received a call from 414-722-0553; however, SA ██████ did not answer. After SA ██████ did not answer, SA ██████ immediately received a text from the same number stating, "Call me." On September 14, 2021, at approximately 9:31 A.M., SA ██████ sent a text to 414-722-0553 stating, "Ay my bad broski didnt even see u hit me. u good?" Approximately one minute later SA ██████ received a response stating, "Yeah."

### E.  THIRD UNDERCOVER TRANSACTION AND IDENTIFICATION OF SECOND CUSTOMER PHONE 414-517-5178 – SEPTEMBER 17, 2021

83.     On September 15, 2021, at approximately 4:37 P.M., SA ██████ received a text

22

from 414-517-5178 stating, "This a1 we back on this number."

84. On September 16, 2021, at approximately 11:28 A.M., SA ████ texted 414-517-5178 and stated SA ████ wished to purchase crack cocaine later that day or the following day. At 11:29 A.M., SA ████ received a text from 414-517-5178 stating, "Lol ok bet got u." Based on training, experience and the investigation regarding the ADTO, Investigators believed this was a second drug customer phone that was being utilized by WEDDLE and his ADTO.

85. On September 17, 2021, at approximately 9:55 A.M., SA ████ texted 414-517-5178 that SA ████ would be coming to meet with WEDDLE later that day. SA ████ received a responds text message at approximately 9:59 A.M, "Call me when here" from 414-517-5178.

86. On September 17, 2021, at approximately 10:46 A.M., at the direction of Investigators, CI #1 called WEDDLE at 414-722-0553 and informed WEDDLE that CI #1 desired to purchase an amount of crack cocaine from WEDDLE later that day. WEDDLE responded, "Yeah come on." Please note, the purpose of this call was to confirm the identity of the individual who possessed the telephone utilizing telephone 414-722-0553 at that time. Additionally, over the course of the investigation, SA ████ learned that at any given time, the individual operating telephone 414-517-5178 was also responsible for operating telephone 414-722-0553.

87. On September 17, 2021, at approximately 12:18 P.M., SA ████ equipped with recording equipment and ATF funds departed a pre-determined staging location in an undercover vehicle (UCV) and traveled towards Gamestop, located at 3907 North Richards Street, Milwaukee, WI 53212.

88. At approximately 12:34 P.M., SA ████ called 414-517-5178 and WEDDLE answered the call, which SA ████ was able to determine based on prior interactions with

23

WEDDLE. SA ███ informed WEDDLE that SA ███ had arrived at Gamestop. WEDDLE asked SA ███ what SA ███ was wanting to purchase. SA ███ responded that SA ███ wanted to purchase a "zip." Based on training and experience, I know a "zip" is common street vernacular used to refer to an ounce of narcotics. WEDDLE responded, "Text me exactly how much you got bro." The call was then disconnected. SA ███ immediately called WEDDLE back and asked how much WEDDLE would charge SA ███ for an ounce of crack cocaine. WEDDLE responded, "Eighteen Hundred ($1,800)."

89.    SA ███ then attempted several times to counter WEDDLE's price of $1,800; however, WEDDLE declined each time to reduce the price. WEDDLE explained, "Now if you want me to go make you some bullshit up I can whip you up some bullshit and give it to you but if you want the shit that I got. You know what I'm saying. I don't wanna (*inaudible*)… If you want the shit that I got, you know what I mean." Based on training and experience, SA ███ understood this to mean WEDDLE was offering to manufacture an ounce of reduced-quality crack cocaine for a reduced price; however, if SA ███ wanted to purchase high-quality crack cocaine, WEDDLE could not offer a reduced price.

90.    Once SA ███ agreed to purchase the ounce of crack cocaine from WEDDLE for $1,800, WEDDLE stated he was on his way to meet SA ███

91.    At approximately 12:41 P.M., SA ███ observed a white Kia sedan with dark tint arrive at the Gamestop parking lot and back into a parking stall approximately twenty yards west of the UCV.

92.    At approximately 12:45 P.M., SA ███ observed a black Kia sedan bearing Illinois (IL) license plate "CN95593" arrive at Gamestop and park directly next to the UCV, in between the white Kia and the UCV. The black Kia was the same vehicle PEREZ-RAMIREZ

24

operated on September 8, 2021.

As the black Kia began to park, SA ███ observed the vehicle was driven by WEDDLE and PEREZ-RAMIREZ was in the front-passenger seat. In the rear-passenger seat of the Kia was an unknown black male, who was later identified as Anthony HENRY. As part of the investigation, Investigator reviewed arrest of WEDDLE, which included one from January 24, 2021, in which WEDDLE and HENRY were arrested together by the Muskego Police Department on drug-related charges. Investigators examined a WI DOT driver's license photograph of HENRY and confirmed HENRY was the individual that occupied the rear-passenger seat of the black Kia on September 17, 2021.

93.     At approximately 12:45 P.M., SA ███ exited the UCV and walked towards WEDDLE's vehicle. As SA ███ walked around the back of WEDDLE's vehicle, WEDDLE exited his car and greeted SA ███ (Figure 5). WEDDLE then instructed SA ███ to enter the rear-driver-side seat as WEDDLE entered the rear-driver-seat of the white Kia.



25

*(Figure 5)*
*Screenshot from the recording of WEDDLE exiting the black Kia and instructing SA
▮▮ to enter the vehicle. Please note, the white Kia is pictured behind WEDDLE.*

94.    SA ▮▮ then entered the rear driver-seat of the black Kia and greeted PEREZ-
RAMIREZ and HENRY. As SA ▮▮ entered the black Kia, SA ▮▮ observed HENRY was
using a cellular telephone.

95.    At approximately 12:47 P.M., WEDDLE exited the white Kia and immediately
re-entered the driver's seat of the black Kia. WEDDLE placed the car in reverse and began
backing out of the parking stall. SA ▮▮ then asked where WEDDLE intended to drive and
WEDDLE responded, "Nowhere Nowhere."

96.    SA ▮▮ then stated he did not wish to ride with WEDDLE and would rather
drive his own vehicle to where WEDDLE intended to go to conduct the transaction. As
WEDDLE began to drive, the vehicle doors had locked, preventing SA ▮▮ to exit. After
several moments, WEDDLE stopped the car and unlocked the doors, allowing SA ▮▮ to exit
black Kia.

97.    As SA ▮▮ walked back towards the UCV, WEDDLE yelled to SA ▮▮
through the rear-passenger window that they had been "sitting out here too long" which was
captured on video (Figure 6).  In this context, SA ▮▮ understood this to mean WEDDLE
wanted to move the transaction location due to having been at Gamestop too long, which may
have potentially attracted the attention of law enforcement.

26



*(Figure 6)*
*Screenshot from the recording as WEDDLE (driver's-seat) yelled to SA ████ through the rear-passenger window. Please note, HENRY is captured in the still-frame seated in the rear-passenger seat.*

98.    At approximately 12:48 P.M., SA ████ in his UCV, followed WEDDLE out of the west exit of the Gamestop parking lot and drove a short distance north on North Palmer Street before turning east into the parking lot of a nearby Popeyes. WEDDLE then backed into a parking stall and waited for SA ████ to walk over to WEDDLE's black Kia. SA ████ exited the UCV, walked over to WEDDLE's vehicle, and re-entered the rear driver-seat.

99.    After SA ████ entered WEDDLE's vehicle, WEDDLE asked SA ████ if SA ████ had a pipe, initially referred to WEDDLE as a "piece." SA ████ responded that he did not possess a pipe and SA ████ was not a user of crack cocaine.  WEDDLE then stated, "You gotta do me a favor bro. You gotta put this on your tongue bro." WEDDLE then turned around and extended his hand towards SA ████  SA ████ observed WEDDLE's hand contained a small piece of suspected crack.

27

100.     After SA ███ then declined to put the substance on his tongue, WEDDLE explained that in order for WEDDLE to complete the transaction with SA ███ SA ███ needed to place the suspected crack cocaine on SA ███ tongue. I know through knowledge, training, and experience that drug dealers often make customers consume narcotics to prove they are not law enforcement.

101.     At approximately 12:51 P.M., CI #1 called WEDDLE. Please note, after the transaction, SA ███ asked CI #1 why CI #1 had called WEDDLE at that time. CI #1 stated he/she had called to ask WEDDLE to ask if the transaction between WEDDLE and SA ███ occurred.

102.     WEDDLE placed the phone on speaker-mode and began speaking with CI #1. WEDDLE then told CI #1 that WEDDLE was uncomfortable selling SA ███ the crack cocaine due to SA ███ purchasing "a whole one." Based on my training, experience, and investigation, I understood this to men an ounce.  WEDDLE then hung up the phone and informed SA ███ that WEDDLE was concerned SA ███ may be a law enforcement officer because of the amount of purported cocaine SA ███ was desiring to purchase. HENRY then demanded SA ███ remove his hat so HENRY could examine the garment.

103.     As HENRY was demanding SA ███ remove his hat, WEDDLE and PEREZ-RAMIREZ, in escalated tones, explained they had concerns that SA ███ may be a member of law enforcement because SA ███ was wanting to purchase such a large amount of narcotics. PEREZ-RAMIREZ further explained that they, members of their ADTO, do not typically sell more than a "ball" to their customers.  Based on my training and experience, I understood this to mean 3.5 grams of a controlled substance.

104.     WEDDLE then expressed concerned about the ramifications of being caught with

28

a large amount of crack cocaine when he stated, "This is ten years. You get caught with this that's ten years. I get caught with it, it's twenty." Based on my training and experience, I understood WEDDLE "ten years" to reference the amount of incarceration that could be enforced by the justice system.

105.    After SA ███ reiterated several times that he was not a member of law enforcement and would not ingest any crack cocaine, WEDDLE handed SA ███ a large amount of purported crack cocaine, which was wrapped inside of a paper receipt. SA ███ then took the substance from WEDDLE and placed it on the cup holder in between SA ███ and HENRY. After receiving the substance from WEDDLE, SA ███ removed SA ███ undercover digital scale from his pocket, placed it on the center cup holder, and weighed the suspected crack cocaine.

106.    Upon transferring the purported crack cocaine from the receipt paper (packaging) to the scale, the weight of the substance was approximately 27.4 grams. SA ███ then informed WEDDLE the purported crack cocaine provided by WEDDLE was "light." HENRY then leaned over and examined SA ███ scale. HENRY then asked why SA ███ was disgruntled about "some tenths." From training and experience, "some tenths" in this context referring to tenths of a gram.

107.    SA ███ responded that SA ███ had been "shorted" the first time SA ███ purchased crack cocaine from WEDDLE and SA ███ did not want to be provided with less crack cocaine than SA ███ had paid for a second time. HENRY then instructed WEDDLE, "Give him another little." WEDDLE then provided SA ███ with another small piece of purported crack cocaine, which SA ███ subsequently placed on the digital scale. With the addition of the small piece, the weight of the substance was approximately 28 grams without

29

packaging.

108.    SA ███ then grabbed a small, sealable bag, which based on my training and experience is for wrapping papers commonly used to smoke marijuana, from the floorboards in front of him. SA ███ then examined the packaging to ensure it was empty and asked if SA ███ could use the empty packaging to conceal the suspected crack cocaine. PEREZ-RAMIREZ then examined the inside of the packaging to observe it was completely empty and allowed SA ███ use the sealable bag. SA ███ then proceeded to empty the suspected crack cocaine on the digital scale into the packaging. Please note, a small amount of suspected crack cocaine fell onto the car seat and cup holder during the transfer process.

109.    SA ███ then counted $1,800 in pre-recorded ATF funds and handed the funds to WEDDLE, who began to count the funds. SA ███ then asked WEDDLE if he had any firearms that were able to be sold to SA ███ WEDDLE explained he did not as things had been "fucked up" and "everyone" was "trying to keep their shit."

110.    As WEDDLE was in the process of counting the ATF funds, PEREZ-RAMIREZ repositioned his left arm, which previously blocked SA ███ view of PEREZ-RAMIREZ's lap. This then allowed SA ███ to observe a silver handgun with a silver and rosewood pistol grip on PEREZ-RAMIREZ's lap (Figure 7 and 8). Please note, SA ███ identified the firearm had characteristics that were identical a Kimber Micro pistol (Figure 9).

30



*(Figure 7)*
*Screenshot from the recordings capturing the firearm on PEREZ-RAMIREZ's lap*



*(Figure 8)*
*Screenshot from the recordings capturing the firearm on PEREZ-RAMIREZ's lap*



*(Figure 9)*
*Stock Photograph taken from Google Images of Kimber Micro*

31

111.    At approximately 12:59 P.M., after WEDDLE finished counting the funds, WEDDLE drove SA ███ back to the UCV, which was parked a short distance from WEDDLE's vehicle in Popeyes' parking lot. SA ███ then thanked WEDDLE, PEREZ-RAMIREZ, and HENRY for the transaction and exited the black Kia. WEDDLE then exited the Popeyes parking lot, turned north on to North Palmer Street, and ultimately traveled eastbound on East Capitol Drive until he was out of sight of SA ███.

112.    After the operation was concluded, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 31.25 grams (with packaging) and field tested positive for crack cocaine.

113.    Continuing on September 17, 2021, following the undercover drug transaction, at approximately 4:13 P.M., Investigators began conducting surveillance at WEDDLE's family members' residence, located at 3268 North 35th Street, Milwaukee, WI, which had also been identified as WEDDLE's possible residence.   Investigators learned of this address after reviewing MPD incident reports involving WEDDLE's family members, who listed the aforementioned address as their permanent residence.

114.    At approximately 4:25 P.M., Investigators observed the black Kia K5 bearing IL plate CN95593 parked on North 35th Street directly in front of the residence, 3268 North 35th Street, facing north.

115.    As Investigators situated their undercover vehicle, they observed the vehicle's front and rear yellow turn signals flash indicated the vehicle was being locked or opened. Investigators were able to observe two black males, who were facing the opposite direction, walk through the gangway and enter the side door associated with 3268 North 35th Street.

32

116.   At about 4:29 P.M., Investigators observed WEDDLE and HENRY, wearing the same clothes he had worn during the undercover narcotics operation, exit the side door of the residence of 3268 North 35th Street. Investigators, utilizing binoculars, observed the handle of a firearm protruding from the front left pant pocket of WEDDLE. An additional handle of a firearm was observed in the front right pant pocket of HENRY. Both WEDDLE and HENRY walked west through the gangway towards the black Kia K5. WEDDLE entered the front passenger seat while HENRY entered the driver's door. The vehicle then turned north on North 35th Street towards West Townsend Avenue.

## F.  IDENTIFICATION OF TARGETS' RESIDENCE OF 1437 SOUTH 71ST STREET, WEST ALLIS, WI

117.   On October 1, 2021, at approximately 6:00 A.M., Investigators initiated surveillance of 1437 South 71st Street, West Allis, WI, which had been identified as a residence possibly associated with WEDDLE and his associates.

118.   At approximately 10:00 A.M., Investigators observed the previously described black Kia K5 park in front of the residence. PEREZ-RAMIREZ and **OBREGON** exited the vehicle with small children and entered the residence after PEREZ-RAMIREZ retrieved a backpack from the vehicle's trunk. Before PEREZ-RAMIREZ and **OBREGON** entered the residence, Investigators observed **OBREGON** utilize keys to unlock the front door.

119.   On October 4, 2021, at approximately 9:30 A.M., Investigators initiated surveillance at 1437 South 71st Street, West Allis, WI. During the surveillance, Investigators observed WEDDLE and a black female, later identified as Janicia MACK-HOWARD, arrive at the residence in a white Audi Q7 bearing WI license plate "AMT9526." Investigators identified MACK-HOWARD after conducting a query of the aforementioned vehicle registration via WI

33

DOT records, which revealed MACK-HOWARD as the registered owner and then examining WI DOT driver's license photographs of MACK-HOWARD.

120. After exiting the vehicle, MACK-HOWARD, driver's side, and WEDDLE, front passenger's side, entered the residence through the front door. Approximately ten minutes later, WEDDLE, MACK-HOWARD, PEREZ-RAMIREZ, and **OBREGON** exited the front door of the residence and entered the white Audi. The white Audi conducted a U-turn on South 71st street and drove north towards Greenfield Avenue until it reached a point where law enforcement personnel could no longer observe the vehicle's direction of travel.

## G. TELEPHONE INTERACTIONS BETWEEN SA ███ AND CUSTOMER PHONES 414-722-0553 AND 414-517-5178 - BETWEEN THIRD AND FOURTH NARCOTICS TRANSACTION

121. On September 18, 2021, at approximately 4:58 P.M., SA ███ texted 414-517-5178, indicating that SA ███ wanted to purchase additional amounts of crack cocaine from WEDDLE and his associates. At 5:07 P.M., SA ███ received a text message response, "Ready when you are."

122. On September 24, 2021, at 7:00 A.M., SA ███ texted 414-517-5178 and stated SA ███ would "come down" later that day. On the same date, at 12:56 P.M., SA ███ texted 414-517-5178 to explain SA ███ could not meet that day but would let WEDDLE and/or his associates know when SA ███ planned to come again. At 4:28 P.M., the 414-517-5178 replied, "Cool."

123. On September 30, 2021, at 1:33 P.M., SA ███ received a text from telephone 414-722-0553 stating, "We around." Based on training and experience, Investigators understood this to mean WEDDLE and his associates had an amount of crack cocaine that could be sold at that time.

34

124.     On October 4, 2021, at 7:28 P.M., SA ███ texted telephone 414-517-5178 and asked if SA ███ could meet with WEDDLE and/or his associates the following day. At 7:29 P.M., SA ███ received a reply stating, "Yeah."

125.     On October 5, 2021, at 11:46 A.M., SA ███ texted telephone 414-517-5178 and stated he planned to come into Milwaukee after 3:00 P.M. SA ███ received a response stating, "K what should I have ready." SA ███ texted back stating SA ███ wished to purchase another ounce, referring to crack cocaine, and asked if the price for the ounce would still be $1,800.

126.     SA ███ then received a response at 12:11 P.M., stating, "Yeah unless you want sum bullshit." At 4:13 P.M., SA ███ texted 414-517-5178, stating SA ███ was unable to meet that day; however, SA ███ would meet on another date to purchase the narcotics.

## H.  FOURTH UNDERCOVER TRANSACTION ARRANGED WITH 414-517-5178 – OCTOBER 6, 2021

127.     On October 6, 2021, at approximately 12:48 P.M., SA ███ texted 414-517-5178 to inform WEDDLE and/or his associates that SA ███ would be in Milwaukee later that day to purchase an amount of crack cocaine.

128.     On October 6, 2021, at approximately 12:57 P.M., SA ███ called 414-517-5178 and was greeted by PEREZ-RAMIREZ, SA ███ identified the individual speaking as PEREZ-RAMIREZ from having previous in-person and telephone contacts with PEREZ-RAMIREZ. SA ███ asked if PEREZ-RAMIREZ could meet SA ███ in approximately one hour. PEREZ-RAMIREZ did not answer SA ███ question but proceeded to ask how much crack cocaine SA ███ wished to purchase. SA ███ explained he wanted to purchase a "zip."

35

129. At 1:53 P.M., SA ███ departed the operation's staging location in an undercover vehicle (UCV) and traveled towards Gamestop. SA ███ was equipped with audio-/videorecording/transmitting equipment and an amount of pre-recorded ATF Funds.

130. At approximately 2:04 P.M., SA ███ initiated the recording equipment and at 2:05 P.M., SA ███ arrived at GameStop's parking lot. After parking the UCV, SA ███ called 414-517-5178 to notify PEREZ-RAMIREZ that SA ███ had arrived at the meet location. PEREZ-RAMIREZ then stated he was on his way to meet SA ███

131. At approximately 2:26 P.M., PEREZ-RAMIREZ called SA ███ using telephone number 414-517-5178 and stated PEREZ-RAMIREZ would be arriving "In like three minutes."

132. At 2:32 P.M., 414-517-5178 texted SA ███ that PEREZ-RAMIREZ was in a "red car." PEREZ-RAMIREZ then sent an immediate follow-up text stating, "Pulling in parking lot." Shortly after receiving the text messages, SA ███ observed a red Nissan Altima with dark tint, bearing "Rosen" auto dealer license plate tags drive into Aldi's parking lot. Aldi is located immediately north of Gamestop, and the businesses' parking lots are separated by a small grass median.

133. SA ███ then received a call from PEREZ-RAMIREZ using 414-517-5178, during which PEREZ-RAMIREZ stated he had arrived at Aldi. SA ███ then informed PEREZ-RAMIREZ that SA ███ observed Carlos's vehicle and SA ███ would walk over to him. As the Nissan parked in front of the UCV, SA ███ observed PEREZ-RAMIREZ occupied the front passenger seat while **OBREGON** occupied the driver's seat.

134. At 2:34 P.M., SA ███ exited the UCV, walked towards the Nissan, and entered the rear driver's-side seat. Upon entering the car, SA ███ was greeted by a small child, who

36

was seated in the rear passenger-side seat. SA  recognized the child to be the same child Investigators observed with PEREZ-RAMIREZ and **OBREGON** at 1437 South 71st Street, West Allis, WI.

135.    After SA ████ greeted the vehicle's occupants, PEREZ-RAMIREZ stated SA ████ caught him at a bad time because he was "out shopping" with his "son" and "wife." PEREZ-RAMIREZ then handed SA ████ a knotted Ziploc-style bag containing an amount of purported crack cocaine (Figure 10).



*(Figure 10)*
*Screenshot from the recordings showing SA* ████ *receiving the suspected crack*

37

*cocaine from PEREZ-RAMIREZ*

136.    SA ███ then asked if the amount of purported crack cocaine being provided was in fact one ounce. PEREZ-RAMIREZ responded, "That's the whole (ounce). I just, when I went to the house, I grabbed that from bro." PEREZ-RAMIREZ further explained, "I called bro, man like uh Dwayne on his way down here for the same thing. He said man come get it I got it ready for him." I know from information learned over the course of this investigation that PEREZ-RAMIREZ refers to WEDDLE as "bro" and SA ███ used the undercover name Dwayne for the investigation. Also based on my training and experience and the conversation between SA. ███ and PEREZ-RAMIREZ, PEREZ-RAMIREZ's reference to "whole" and "same thing" meant ounce of crack cocaine.

137.    SA ███ then asked PEREZ-RAMIREZ why PEREZ-RAMIREZ would not sell SA ███ the firearm, referring to the silver and rosewood Kimber Micro brandished during the previous transaction on October 6, 2021 by PEREZ-RAMIREZ. PEREZ-RAMIREZ replied, "which one?" SA ███ then described the firearm as small and silver. PEREZ-RAMIREZ replied, "That's hers" as he nodded towards **OBREGON**. PEREZ-RAMIREZ then stated, "That's my wife's (gun)."

138.    **OBREGON** then reached between the driver's seat and the center console and produced a black Glock pistol with an extended magazine for SA ███ to see. **OBREGON** explained, "This is my other one." **OBREGON** then handed the pistol to PEREZ-RAMIREZ, who continued to display the firearm for SA ███ to observe.

139.    SA ███ asked PEREZ-RAMIREZ if he had a "hook up" on firearms. PEREZ-RAMIREZ explained **OBREGON** goes to "the store" to purchase the firearms, which based on my training and experience I believe to mean a licensed gun store. SA ███ then asked if SA

38

████ could handle the firearm. PEREZ-RAMIREZ then handed the pistol to SA ████ (Figure 11). As PEREZ-RAMIREZ handed the pistol to SA ████ **OBREGON** warned SA ████ "There's one up though." In this context, based on my training and experience meat a live round was in the chamber of the gun. SA ████ then examined the firearm and observed that the pistol was a Glock 19 pistol. SA ████ also identified the magazine could hold up to 30 rounds of 9mm caliber ammunition.

140.    SA ████ then asked **OBREGON** and PEREZ-RAMIREZ if the firearm could be purchased. **OBREGON** indicated she did not want to sell the firearm when she stated, "It's in my name." PEREZ-RAMIREZ also expressed an inability to sell the firearm by stating, "It's in her name."

141.    SA ████ then asked where SA ████ could find an extended magazine to purchase due to extended magazines being difficult to find. PEREZ-RAMIREZ responded, "In the store! In the store! You can walk in the store and buy them!"

142.    After declining to sell the Glock 19, PEREZ-RAMIREZ stated, "I can get you some though" referencing firearms. PEREZ-RAMIREZ then stated he would speak with WEDDLE and they would contact SA ████ when they had firearms available to be sold.

143.    SA ████ then handed the firearm back to PEREZ-RAMIREZ and stated there was more money to be made in selling firearms compared to narcotics. PEREZ-RAMIREZ smiled and stated, "I know I know."

39



*(Figure 11)*
*Screenshot from the recordings showing SA* █████ *handing the firearm back to PEREZ-RAMIREZ*

144.    PEREZ-RAMIREZ then guided the discussion back to the purported crack cocaine transaction and stated, "You said eighteen right?" In this context, SA █████ understood this to mean PEREZ-RAMIREZ was confirming the price for the purported crack cocaine provided to SA █████ was $1,800. SA █████ then counted $1,800 in ATF Funds and handed the Funds to PEREZ-RAMIREZ, who confirmed the amount of money provided was $1,800.

145.    At 2:36 P.M., SA █████ thanked PEREZ-RAMIREZ and began exiting the Nissan. PEREZ-RAMIREZ then shouted to SA █████ "Call us whenever you're ready." SA █████ then walked back to his vehicle and reentered the UCV. SA █████ observed the Nissan drive east towards North Richards Street until the vehicle was out of sight.

146.    After the operation, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 22.23 grams (with packaging) and field-tested positive for crack cocaine.

147.    Continuing on October 6, 2021, SA █████ called 414-517-5178. WEDDLE answered the phone and stated, "Yo yo." SA █████ immediately identified the individual speaking as WEDDLE from having previous in-person and telephone contacts with WEDDLE.

148.    SA █████ informed WEDDLE that the purported crack cocaine SA █████ had

40

purchased earlier that day from PEREZ-RAMIREZ was nine grams less than the ounce SA ███ had paid for. WEDDLE attempted to explain the reason for the shortage when he stated, "That's the scale bro."

149.    SA ███ explained SA ███ did not weigh the amount in the car when he was with PEREZ-RAMIREZ, so SA ███ did not realize the shortage until after the transaction had occurred. WEDDLE explained SA ███ had dealt with WEDDLE's "Lil Bro", PEREZ-RAMIREZ, and he, PEREZ-RAMIREZ may not have known about the shortage.

150.    WEDDLE then stated SA ███ should "come in" because WEDDLE would be working "until the morning." Based on training and experience, myself and Investigators understood this to mean WEDDLE and his associates worked the telephone in shifts, and WEDDLE was working the current shift; therefore, WEDDLE would settle the shortage if SA ███ came to pick up the nine grams at that time.

151.    After SA ███ explained he was unable to meet WEDDLE at that time, WEDDLE explained SA ███ was now "ten up however you wanna do it." Based on training, experience, and the investigation in this matter, Investigators understood "ten up" to mean WEDDLE owed SA ███ ten grams of crack cocaine, which would be provided to SA ███ during the next transaction.

152.    WEDDLE then stated SA ███ would only deal with WEDDLE directly during future transactions in an effort to prevent further complications. WEDDLE explained, "When you call if he (PEREZ-RAMIREZ) got the phone he gonna have you call me."

**I.  SURVEILLANCE AT 1437 SOUTH 71ST STREET, WEST ALLIS, WI**

153.    On October 8, 2021, beginning at approximately 8:55 A.M., Investigators briefly conducted surveillance at 1437 South 71st Street, West Allis, WI. As Investigators passed the

41

residence, Investigators observed a red Nissan Altima with "Rosen" dealer plates parked directly in front of the residence on the west side of 71st Street (Figure 12). This Nissan was the same vehicle that was utilized by PEREZ-RAMIREZ and **OBREGON** on October 6, 2021, when they sold crack cocaine to SA ███ while armed with a Glock 19 pistol bearing an extended magazine.



*(Figure 12)*
*Photograph of the red Nissan parked in front of 1437 South 71st Street, West Allis, WI*

### J. IDENTIFICATION OF FIREARMS TRANSACTION RECORD FOR GLOCK 19 PISTOL BRANDISHED ON OCTOBER 6, 2021

154. During the week of October 25, 2021, ATF Inspector (IOI) Matthew Peterson conducted an inspection of The Shooters Shop, which is a Federal Firearms Licensee (FFL) in West Allis, WI. During IOI Peterson's review of The Shooters Shop Acquisition and Disposition records (A&D records), Peterson observed **OBREGON** purchased a Glock 19 pistol on May 11, 2016.

155. IOI Peterson received a copy of the ATF Form 4473, Firearms Transaction

42

Record, from The Shooters Shop and subsequently provided a copy of the 4473 to Investigators. The 4473 identified on May 11, 2016, The Shooters Shop transferred a Glock 19 pistol to **OBREGON**.

### K. FIFTH UNDERCOVER TRANSACTION ARRANGED WITH 414722-0553 AND 414-517-5178 TO OBTAIN SHORTED CRACK COCAINE - NOVEMBER 1, 2021

156.     On October 25, 2021, SA ████ communicated with 414-722-0553 and 414-517-5178 via text message and telephone calls for the purpose of obtaining nine grams of crack cocaine from WEDDLE and his associates, which was a debt owed to SA ████ from prior undercover purchases, first transaction from September 1, 2021 and fourth transaction from October 6, 2021.

157.     On October 25, 2021, at approximately 3:40 P.M., SA ████ spoke with PEREZ-RAMIREZ on telephone number 414-517-5178. PEREZ-RAMIREZ stated he would be meet SA ████ at Gamestop, located at 3907 N Richards Street; however, this meeting never occurred on October 25, 2021. On October 26, 2021, the following morning, PEREZ-RAMIREZ called SA ████ and explained he was unable to meet SA ████ the previous day due to a "family emergency." During the investigation in this matter, Investigators learned that WEDDLE had been arrested by the Milwaukee County Sheriff's Department on October 25, 2021.

158.     SA ████ and PEREZ-RAMIREZ agreed SA ████ could come back to Milwaukee on a future date to obtain the nine grams of crack cocaine still owed to SA ████.

159.     Continuing on October 31, 2021, SA ████ communicated with telephone 414-722-0553 to arrange for SA ████ to receive the nine grams from WEDDLE and his associates on November 1, 2021 at the GameStop, located at 3907 N Richards Street.

160.     On November 1, 2021, at approximately 1:35 P.M., SA ████ departed the

43

operation's staging location in an undercover vehicle (UCV) and traveled towards Gamestop located at 3907 N Richards Street. SA ███ was equipped with audio-/videorecording/transmitting devices.

161.  At approximately 1:44 P.M., SA ███ arrived at Gamestop and parked on the west end of the parking lot. At approximately 1:45 P.M., SA ███ called 414-517-5178. PEREZ-RAMIREZ answered the phone. SA ███ identified the individual speaking as PEREZ-RAMIREZ from having previous in-person and telephone contacts with PEREZ-RAMIREZ. SA ███ informed PEREZ-RAMIREZ that SA ███ was waiting for him near Aldi, which is adjacent lot to Gamestop. PEREZ-RAMIREZ then informed SA ███ he would arrive at the location shortly.

162.  At approximately 2:03 P.M., SA ███ received a call from 414-517-5178 by WEDDLE, though WEDDLE was not operating the phone originally. SA ███ identified the individual speaking as WEDDLE from having previous in-person and telephone contacts with WEDDLE. WEDDLE instructed SA ███ to meet him at Popeyes, located at 207 E Capitol Drive, Milwaukee, WI. WEDDLE referred to this location as "The spot I drove to last time." Several moments later, SA ███ departed GameStop's parking lot and drove the UCV to Popeyes, which was located a short distance northwest of Gamestop.

163.  As SA ███ pulled into the parking lot, SA ███ observed a white Volkswagen Passat with dark tint was backed into a parking stall a short distance to the east of SA ███ As SA ███ parked the UCV, WEDDLE, who was seated in the driver's seat of the Passat, rolled down the window and called for SA ███ to come over to the white Passat.

164.  SA ███ then walked over to WEDDLE's Passat and attempted to open the rear-driver-side door. PEREZ-RAMIREZ, who was seated in the rear driver's-side seat, cracked open

44

the door and instructed SA ███ to get in the rear-passenger seat. SA ███ then walked around the rear of the vehicle and observed the white Passat had no license plate displayed on the rear-bumper/trunk.

165.    SA ███ then entered the rear passenger-seat and observed an unknown black male wearing a yellow hooded sweatshirt seated in the front passenger seat. After SA ███ sat down inside the car and shut the door, WEDDLE reached his right hand behind him and provided SA ███ with a small, clear plastic baggie containing an amount of purported crack cocaine. WEDDLE then stated, "That's six on what we owe you bro", based on training and experience Investigator understood this to mean six grams. After asking for clarification on why SA ███ was not receiving the nine grams which was owed to SA ███ WEDDLE stated, in substance, that providing SA ███ with six grams was "fair." SA ███ then placed the substance in his pocket and exited the vehicle.

166.    After the operation on November 1, 2021, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 5.38 grams (with packaging) and field-tested positive for crack cocaine.

**L.  SURVEILLANCE OF 3268 NORTH 35TH STREET, MILWAUKEE, WI**

182.    On November 3, 2021, beginning at approximately 11:30 A.M., Investigators initiated surveillance at 3268 North 35th Street, Milwaukee, Wisconsin, a residence associated with WEDDLE based on the investigation and prior surveillance.

183.    At approximately 11:39 A.M., Investigators drove past the residence and observed a white Volkswagen Passat bearing no license plate parked directly in front of the residence, on the east side of North 35th Street. Investigators identified the Passat as the same vehicle WEDDLE utilized on November 1, 2021, when he provided SA ███ with 5.38 grams

45

of crack cocaine.

184.    At approximately 11:41 A.M., Investigators observed MACK-HOWARD's white Audi Q7 park in front of 3268 North 35th. Street, directly behind the white Passat (Figure 13). This was the same vehicle WEDDLE and MACK-HOWARD were previously observed exiting at the location of 1437 South 71st Street, West Allis, WI by law enforcement on October 4, 2021. After the Audi parked, Investigators observed MACK-HOWARD exit the Audi and enter the gangway on the south side of the residence of 3268 North 35th Street.



*(Figure 13)*
*White Volkswagen Passat (closest vehicle) and Audi Q7 (rear vehicle)*

185.    At approximately 11:48 A.M., Investigators observed WEDDLE and MACK-

46

HOWARD emerge from the gangway on the south side of the residence of 3268 North 35th. Street. WEDDLE then escorted MACK-HOWARD to the Audi and held the driver-side door open as MACK-HOWARD entered the driver's seat. WEDDLE then closed the door, walked to the Volkswagen Passat, and entered the driver's seat.

186. At 11:54 A.M., Investigators observed WEDDLE drive the Passat north on North 35th Street. Officers Malafa and Domine then followed WEDDLE in their undercover vehicle. The Officers followed WEDDLE on the following route:

        a.  35th Street to Townsend Street;
        b.  Townsend Street to Hopkins Street;
        c.  Hopkins Street to Locust Street;
        d.  Locust Street to Richards Street; and
        e.  Richards Street to Center Street.

187. Officers Malafa and Domine terminated their mobile surveillance at approximately 12:03 P.M., after WEDDLE continued east on Center Street past North Holton Avenue.

188. Approximately twenty seconds after WEDDLE departed 3268 North 35th Avenue, Investigators observed MACK-HOWARD, operating the Audi, conduct a U-turn in the middle of North 35th street and drive south. Investigators then followed the vehicle along the following route:

        a.  35th Street to West Fond Du Lac Avenue;
        b.  Fond Du Lac Avenue to Burleigh Street; and
        c.  Burleigh Street to North 27th Avenue.

189. Investigators temporarily terminated the surveillance at approximately 11:59A.M., after MACK-HOWARD turned north onto North 27th Avenue.

190. At approximately 12:07 P.M., as Investigators drove east on Wright Street, past North Palmer Street, Investigators observed WEDDLE, operating the Volkswagen Passat, drive

47

west on Wright Street, directly past Investigators. Investigators then conducted a U-Turn and caught up to WEDDLE as he drove west on Wright Street, past North 1st Street.

191.    At approximately 12:09 P.M., Investigators observed WEDDLE make a northbound turn onto North 2nd Street. After traveling a short distance north on North 2nd Street, WEDDLE conducted a U-Turn to travel south on North 2nd Street. After making the U-Turn, WEDDLE parked his vehicle directly behind a white Audi Q7 bearing WI license plate "AMT9526", MACK-HOWARD's vehicle.

192.    Approximately 90 seconds after Investigators passed WEDDLE and MACK-HOWARD parked near the intersection of North 2nd Street and Wright Street, Investigators returned to the proximity of the intersection to initiate further surveillance; however, both vehicles were no longer present.

193.    On November 3, 2021, Investigators queried MACK-HOWARDS's State of Wisconsin Circuit Court records. Per WI Circuit Court records, in October 2020, MACK-HOWARD was cited in Milwaukee County for operating a vehicle while suspended. MACK-HOWARD provided an address of 2519 N 2nd Street, Apartment 4, Milwaukee, WI, which is located on the northwest corner of the intersection of North 2nd Street and East Wright Street. Additionally, upon further investigation into open-source records, MACK-HOWARD's mother, Leatrice HOWARD, had an active address of 2515 N 2nd Street, Apartment 1, Milwaukee, WI, which is located on the northwest corner of North 2nd Street and East Wright Street.

194.    On November 3, 2021, Investigators queried "Alex WEDDLE" via open-source commercial databases. Open-source information revealed WEDDLE is associated with the residence located at 2540 N 1st Street, Milwaukee, WI, which is located one block east of the intersection of North 2nd Street and East Wright Street.

48

195.    On November 3, 2021, Investigators queried "Janicia MACK-HOWARD" via WI DOT records. DOT records revealed on October 29, 2021, MACK-HOWARD changed her DOT address to 1437 South 71st Street, West Allis, WI, which is the same residence utilized by Carlos PEREZ-RAMIREZ and **Marisela OBREGON**.

**M. SURVEILLANCE OF 1437 SOUTH 71ST STREET – NOVEMBER 4, 2021**

196.    On November 4, 2021, beginning at 11:30 A.M., Investigators initiated surveillance at 1437 South 71st Street, West Allis, WI.

197.    At approximately 11:42 A.M., Investigators observed MACK-HOWARD's Audi Q7 arrive at the residence of 1437 South 71st Street. Approximately twelve minutes later, MACK-HOWARD and WEDDLE exited the driver and front passenger seats, respectively. WEDDLE and WEDDLE then handed MACK-HOWARD a set of keys (Figure 14 and 15). MACK-HOWARD pointed the keys at the white Audi and the lights on the vehicle flashed, indicating the vehicle was locked.

198.    At approximately 11:48 A.M. Investigators checked the prospective cell-site information ("pings") authorized by state search warrants for telephone numbers 414-517-5178 and 414-722-0553. The pings showed at 11:46 A.M., as WEDDLE and MACK-HOWARD were parked in front of 1437 South 71st Street, neither device associated with the aforementioned numbers were in the area of 1437 South 71st Street. However, the phones' ping radius, 299 meters, at 11:46 A.M., did encompass 3216 North Humboldt Street, Milwaukee, WI, an address **OBREGON** had previously provided to WI DOT as her permanent residence.

199.    At approximately 11:55A.M., WEDDLE and MACK-HOWARD walked up to the front door of 1437 South 71st Street and MACK-HOWARD utilized the keys provided to her by WEDDLE to unlock and open the front door.

49



*(Figure 14)*
*11:54 A.M.: WEDDLE (Left) and MACK-HOWARD (Right) Exiting White Audi (right of MACK-HOWARD)*



*(Figure 15)*

50

*WEDDLE handing MACK-HOWARD a set of keys which were used to lock the white Audi and unlock 1437 S 71st Street front door.*

200.    At approximately 12:10 P.M., a red Nissan Altima bearing WI license plate "AMW9537" turned south on South 71st Street and parked in front of the residence on the west side of South 71st Street. Approximately two minutes later, **OBREGON** exited the driver's seat of the red Altima and entered 1437 South 71st Street through the front door. After **OBREGON** arrived in the red Altima, there were no parking spaces available in front of 1437 South 71st Street.

201.    At approximately 12:15 P.M., MACK-HOWARD's Audi's lights flashed, indicating the vehicle had been remotely unlocked or locked.

202.    At approximately 12:15 P.M., an unknown light-skinned male (hereinafter "unknown male 1" ("UM #1"), wearing red pants, brown sweatshirt, and a ski mask exited the front door of 1437 South 71st Street holding a black bundle in his hands (Figure 16). UM #1 walked over to the white Audi Q7. When UM #1 reached the Audi, UM #1 opened the front passenger door and leaned his torso inside the Audi. UM #1 then walked back inside 1437 South 71st Street with no objects in his hands.

51



*(Figure 16)*
*UM #1 (left) walking to MACK-HOWARD's Audi from 1437 S 71st St*

203.    At approximately 12:18 P.M., **OBREGON** exited the front door of 1437 South 71st Street, reached inside the back passenger compartment of the red Altima, and went back inside the residence.

204.    At approximately 12:26 P.M., the previously described white Volkswagen Passat turned south onto South 71st Street from Greenfield Avenue. As the Passat passed 1437 South 71st Street, the vehicle decreased its speed. Investigators determined this reduction in speed was indicative of a driver examining the area for available parking spaces. After passing the residence, the vehicle picked up speed and continued traveling south on South 71st Street before turning west onto West Orchard Street. Please note, an alley with additional parking and the residence's garage runs north/south behind 1437 South 71st Street.

205.    At approximately 12:35 P.M., after observing the white Volkswagen Passat, Investigators checked pings authorized by state search warrants for telephone numbers 414-517-5178 and 414-722-0553. The location data showed the most recent location data was delivered at

12:31 P.M. The location data identified the ping radiuses for both devices for both numbers were currently encompassing 1437 South 71st Street.

206.    At approximately 12:51 P.M., MACK-HOWARD exited the front door of the residence and entered the Audi Q7. MACK-HOWARD then conducted a U-Turn and drove north on South 71st Street before turning east on West Greenfield Avenue.

207.    At approximately 1:30 P.M., Investigators terminated surveillance.

208.    On November 4, 2021, Investigators queried the license plate from the red Nissan Altima operated by **OBREGON**. WI DOT registration information provided the car was registered to **OBREGON**. The registration address was identified as 1437 South 71st Street, West Allis, WI.

**N. MILWAUKEE COUNTY SHERIFF'S DEPARTMENT ARREST OF WEDDLE AND INITIAL REPORT OF 414-839-8056 BEING USED BY MACK-HOWARD – OCTOBER 25, 2021**

209.    On November 6, 2021, Investigators spoke with Milwaukee County Sheriff's Office (MCSO) Deputy John Guillot. Deputy Guillot stated on October 25, 2021, WEDDLE was arrested by MCSO on charges consisting of felon in possession of a firearm and disorderly conduct.

210.    Deputy Guillot stated on October 25, 2021, MCSO received a report from a citizen that a black male, later identified as WEDDLE, who was the passenger in a white Audi SUV, later identified as MACK-HOWARD's Audi Q7, had held up an amount of United States Currency and pointed a pistol at a citizen on Interstate 41 near West Rawson Avenue. A short time later, MCSO Deputies were able to locate MACK-HOWARD's Audi near North 20th Street and West Capitol Drive in Milwaukee. Deputies subsequently performed a high risk-traffic stop and took the vehicle's occupants, WEDDLE who was the front passenger, and MACK-

53

HOWARD, who was the driver, into custody. When WEDDLE was patted down for weapons, deputies recovered approximately $8,000 in cash from WEDDLE's front pants pocket.

211.    After WEDDLE and MACK-HOWARD were detained, deputies observed a Smith & Wesson pistol tucked in between the front passenger seat and the center console of MACK-HOWARD's vehicle.

212.    Investigators received the firearm's description, pistol, Smith & Wesson, SD9VE, bearing serial number FCM5246, from MCSO, they conducted a trace of the firearm back to the original purchaser. Through firearms tracing, Investigators identified MACK-HOWARD as the original purchaser and learned she purchased the firearm from Dunham's (FFL) in West Allis, WI, in June 2020.

213.    Investigators later received copies of the MCSO arrest reports and confirmed what Deputy Guillot had told Investigators.

214.    Furthermore, MCSO Incident Reports identified MACK-HOWARD provided telephone numbers 414-839-8056 and 414-233-6626 as her contact telephone numbers. MACK-HOWARD provided deputies with a residential address of 2519 North 2nd Street, Milwaukee, WI, while WEDDLE provided Deputies with a residential address of 3266 North 35th Street, Milwaukee, WI.

215.    On November 10, 2021, Investigators queried "3266 North 35th Street" via Milwaukee County Assessor's Office Data and identified 3266 N 35th Street is one of the two duplex units at 3266/3268 N 35th Street, Milwaukee, WI.

### O.  ANALYSIS OF JAIL CALLS MADE FROM MILWAUKEE COUNTY JAIL IDENTIFYING 414-839-8056 AND 414-627-7500

#### a.  <u>TELEPHONE NUMBER 414-839-8056</u>

216.    On November 8, 2021, Investigators received call detail records (CDRs) and subscriber information from Drug Enforcement Administration (DEA) Task Force Officer Nicholas Kropp for telephone number 414-839-8056. The subscriber information, which was provided by the mobile carrier, T-Mobile, identified the subscriber for the number as "Janicia HOWARD." T-Mobile provided the billing address for MACK-HOWARD as 2519 North 2nd Street, Apartment 4, Milwaukee, WI as of May 17, 2021. Investigators originally identified 414-839-8056 after observing this number in frequent communication with 414-722-0553 and 414-517-5178, numbers used by WEDDLE and his associates to traffic-controlled substances.

217.    On November 10, 2021, Investigators queried telephone number 414-839-8056 within the Milwaukee County Jail's (MCJ's) CDRs. This query identified WEDDLE called 414-839-8056 ten times between October 25, 2021 and October 27, 2021, after he was arrested by MCSO on October 25, 2021.

218.    On October 25, 2021, at approximately 6:36 P.M., WEDDLE called MACK-HOWARD at 414-839-8056. WEDDLE asked MACK-HOWARD to add money to WEDDLE's MCJ account, so he could make additional calls from MCJ.  WEDDLE asked MACK-HOWARD if she received her vehicle (Audi Q7) back from the MCSO. After MACK-HOWARD confirmed she had received her vehicle.  WEDDLE asked if MACK-HOWARD retrieved a "blunt under the seat… Under the passenger seat." After MACK-HOWARD explained she had not retrieved anything under the front passenger seat, WEDDLE instructed MACK-HOWARD to retrieve the item so "nobody else" could "take it." WEDDLE then informed MACK-HOWARD that deputies had recovered only MACK-HOWARD's firearm from the vehicle and failed to recover the item under the front passenger seat.

219.    During this call, WEDDLE stated "Chip" was his cousin, and then asked MACK-

55

HOWARD if she remembered the "thing" WEDDLE received from "Chip." MACK-HOWARD confirmed she knew what WEDDLE had received from "Chip" and agreed to retrieve the item from under the front passenger seat of her vehicle. Although WEDDLE initially described the item under the front passenger seat as a "blunt," WEDDLE now described the item under the front passenger seat as "the thing I got from 'Chip'." I know through training and experience that jail inmates are often vague and/or speak in code when discussing contraband, i.e. firearms and narcotic, on recorded jail calls to avoid detection by law enforcement.

220. During this recorded jail call on October 25, 2021 an unidentified male #2 (UM #2) then entered the conversation with MACK-HOWARD and greeted WEDDLE by stating "Hey Unc." WEDDLE instructed UM #2 to retrieve the item under MACK-HOWARD's front passenger seat when he stated, "Hey go get that from under the seat for her." UM #2 responded, "It's in Granny's room." WEDDLE then resumed speaking with MACK-HOWARD and stated, "Man how they ain't find that blunt." MACK-HOWARD, in agreement with WEDDLE, replied, "Right? I don't know." WEDDLE then laughed and stated, "That's how you know I'm out this bitch." WEDDLE then proceeded to ask if MACK-HOWARD had spoken to "Brother." MACK-HOWARD stated "Brother" had dropped off "weed" and "food" for her and her children. UM #2, later referred to as "Nephew" by MACK-HOWARD, re-entered the conversation and stated he saw WEDDLE being arrested on Facebook. UM #2 stated he observed "everything," including MACK-HOWARD's "Audi." UM #2 stated he zoomed in while watching the Facebook video to confirm the license plate of the "Audi."

221. On October 26, 2021, at approximately 12:47 P.M., WEDDLE called MACK-HOWARD at 414-839-8056. WEDDLE informed MACK-HOWARD, "Like five of my hypes came and brought shit to my door." Based on my training and experience, in this context, I

56

understood this to mean five of WEDDLE's narcotic customers were incarcerated with WEDDLE at MCJ.

222.    On October 26, 2021, at approximately 5:16 P.M., WEDDLE called MACK-HOWARD at 414-839-8056.  WEDDLE asked MACK-HOWARD what she had been doing. MACK-HOWARD stated she had just finished meeting with "Brother" and getting "weed" from "AJ." MACK-HOWARD informed WEDDLE that UM #2 was upset about something that had happened with one of WEDDLE's associates. UM #2 then entered the conversation and stated an individual familiar with WEDDLE had upset UM #2. Investigators identified UM #2 as the same individual previously referenced by recognizing UM #2's distinct voice. WEDDLE then stated, "You know what to do if you feel too disrespected; you still with me."  WEDDLE then asked MACK-HOWARD if she received a "zip" from "AJ." Based on training and experience, I know that a "zip" is common street vernacular used to reference an ounce of narcotic. MACK-HOWARD stated "Bro" received a "zip" and MACK-HOWARD had received another amount. WEDDLE then stated, "That should last you until I get out."

223.    On October 27, 2021, at approximately 10:56 A.M., WEDDLE called MACK-HOWARD at 414-839-8056. MACK-HOWARD informed WEDDLE that UM #2, referred to by MACK-HOWARD as "Zay Bay" (phonetic spelling), had been playing loud music and taking videos of himself that were posted to Facebook. MACK-HOWARD then stated UM #2 had captured MACK-HOWARD's vehicle and license plate in the videos. WEDDLE then became upset and expressed concern that law enforcement would be able to identify where WEDDLE was residing if they viewed the Facebook video. MACK-HOWARD then suggested painting her vehicle another color or changing the license plates on the vehicle.  WEDDLE then instructed MACK-HOWARD to give the phone to UM #2, so WEDDLE could confront UM #2. Upon UM

57

#2 answering the phone, WEDDLE expressed great frustration with UM #2 and asked why UM #2 was filming "my car" and publishing the videos. Investigators identified UM# 2 as the same individual previously referenced by recognizing UM #2's distinct voice.

224. On October 27, 2021, at approximately 11:26 A.M., WEDDLE called MACK-HOWARD at 414-839-8056. WEDDLE instructed MACK-HOWARD to contact "Brother" so MACK-HOWARD could tell "Brother" to pay WEDDLE's bail. WEDDLE stated his bail was $1150 for his Milwaukee County charges and $350 for active charges in Waukesha County.

225. On October 27, 2021, at approximately 11:37 A.M., WEDDLE called MACK-HOWARD at 414-839-8056. WEDDLE asked if MACK-HOWARD spoke with "Lil Bro" regarding "Lil Bro" paying WEDDLE's bail. MACK-HOWARD confirmed she spoke to "Lil Bro."

### b. TELEPHONE NUMBER 414-627-7500

226. As previously mentioned, Investigators received CDRs for 414-839-8056, which was identified by the mobile carrier as the telephone number belonging to MACK-HOWARD. On November 10, 2021, Investigators examined telephone numbers that were in frequent contact with MACK-HOWARD. Investigators identified telephone number 414-627-7500, which carrier is T-Mobile, had been frequently contacted by MACK-HOWARD.

227. On November 10, 2021, Investigators queried "414-627-7500" in the MCJ's CDRs. The first identified call to 414-627-7500 was made by a MCJ inmate on April 1, 2020.

228. Investigators identified the first call that 414-627-7500 answered occurred on September 21, 2020. The MCJ inmate, identified by CDRs as "Alliondra Williams" called the number and a male's voice answered Williams's call. Immediately, Investigators identified the male's voice as WEDDLE's from having previously interacted with WEDDLE in person and

58

over the telephone. WEDDLE stated he was not "fucking" with Williams anymore because Williams had taken WEDDLE's money.

229.    Investigators also identified WEDDLE answered telephone calls using telephone number 414-627-7500 from different MCJ inmates on the following dates:

    a.  September 29, 2020, at approximately 3:25 P.M.
    b.  December 21, 2020, at approximately 5:52 P.M.
    c.  January 1, 2021, at approximately 4:32 P.M.
    d.  February 7, 2021, at approximately 5:23 P.M.
    e.  February 7, 2021, at approximately 7:14 P.M.
    f.  February 7, 2021, at approximately 8:12 P.M
    g.  September 1, 2021, at approximately 10:04 P.M.

230.    Additionally, on September 21, 2021, at approximately 9:52 P.M., MCJ inmate, Kimberly Boots, called 414-627-7500 and asked for "A." A male's voice greeted Boots and stated Boots was speaking with WEDDLE's "little brother."

231.    Please note, MCJ CDRs identified 414-627-7500 was called by MCJ inmates 128 separate times since April 1, 2020; however, the only calls that were answered by 414-627-7500 are the calls previously referenced.

**P.  IDENTIFICATION OF OBREGON'S CELLULAR NUMBER 414-690-4086**

232.    On November 10, 2021, Investigators identified telephone number 414-690-4086 as a number that was in frequent communication with MACK-HOWARD's telephone number 414-839-8056. Investigators subsequently queried "414-690-4086" via open-source databases and identified the number is a listed telephone number for **OBREGON**.

233.    Additionally, Investigators reviewed MPD body camera footage from the September 3, 2021, incident in which **OBREGON** and PEREZ-RAMIREZ were involved in a vehicle accident. During the interaction with responding MPD Officers, **OBREGON** provided telephone number 414-690-4086 as her contact telephone number.

59

234.    On November 18, 2021, DEA Task Force Officer Dwain Monteilh received call detail records and subscriber information for 414-690-4086 from AT&T Mobility. The subscriber information identified the user email as MARISELA.OBREGON@ICLOUD.COM (the "account") user address as 3123 S Brisbane Ave, Milwaukee, WI 53207 and the service start date as January 14, 2021.

### Q. SURVEILLANCE AT 2519 NORTH 2ND STREET, MILWAUKEE, WI – NOVEMBER 16, 2021

235.    On November 16, 2021, at approximately 4:38 P.M., Investigators began surveillance at 2519 North 2nd Street, Milwaukee, WI, which is an address associated with MACK-HOWARD.

236.    At 4:38 P.M., Investigators observed MACK-HOWARD's Audi Q7 parked on North 2nd Street, which is on the east side of the apartment complex (Figure 17).



*(Figure 17)*
*MACK-HOWARD's Audi parked on North 2nd Street*

237.    At approximately 5:45 P.M., Investigators observed a slender black male with a

60

hood over his head unlock the vehicle and lean inside the front-passenger compartment. After several moments, the male closed the front-passenger door and opened the vehicle's rear-hatch to access the cargo-compartment of the Audi. After approximately one minute, Investigators then observed the male emerge from the cargo-compartment holding two white, plastic grocery bags. The male then closed the rear-hatch, locked the vehicle, and entered the apartment complex's property through the fence on the east side of the building.

238.    At approximately 5:49 P.M., Investigators observed the same male emerge from the fence on the east side of the complex and unlock the Audi. The male then walked to the back of the vehicle and opened the rear-hatch. Investigators then observed the male rearranging items in the back-cargo area of the vehicle before he closed the rear-hatch and locked the vehicle. The male then went back through the fence on the east side of the building to re-enter the complex's property.

239.    At approximately 6:40 P.M., Investigators terminated the surveillance.

**R. SIXTH UNDERCOVER TRANSACTION WITH 414-722-0553 AND 414-517-5178– NOVEMBER 17, 2021**

240.    On November 17, 2021, beginning at approximately 7:22 A.M., SA ▉▉▉▉ began communicating via text with telephone numbers 414-722-0553 and 414-517-5178 for the purpose of purchasing an amount of crack cocaine from WEDDLE and members of his ADTO. Over the course of several text messages, SA ▉▉▉▉ arranged to purchase fourteen grams, approximately 1/2 ounce, of crack cocaine from the ADTO. Please note, SA ▉▉▉▉ communicated and confirmed with both numbers that SA ▉▉▉▉ wished to purchase a half ounce of crack cocaine.

241.    At approximately 1:29 P.M., SA ▉▉▉▉ called 414-517-5178; however, there was

61

no answer. At approximately 1:31 P.M., SA ██████ called the number again and spoke with PEREZ-RAMIREZ. SA ██████ identified the individual speaking as PEREZ-RAMIREZ from having previous in-person and telephone contacts with PEREZ-RAMIREZ. SA ██████ asked PEREZ-RAMIREZ if PEREZ-RAMIREZ could meet SA ██████ at a location west of Milwaukee, WI. PEREZ-RAMIREZ stated he would not travel further than "43rd (Brewers Boulevard/Miller Park Way) and National."

242.    PEREZ-RAMIREZ then suggested meeting at "IHOP," which is located at the intersection of Brewers Boulevard and National Avenue in West Milwaukee, WI. SA ██████ agreed to meet at the IHOP and informed PEREZ-RAMIREZ that SA ██████ would call PEREZ-RAMIREZ once SA ██████ was in the area.

243.    At approximately 1:46 P.M., SA ██████ departed the operation's staging location in an UCV while followed by an ATF cover team. SA ██████ was equipped with audio-/videorecording/transmitting devices and an amount of pre-recorded ATF buy money. At approximately 1:48 P.M., SA ██████ initiated the recording equipment.

244.    At approximately 1:58 P.M., SA ██████ called 414-517-5178 and spoke with PEREZ-RAMIREZ. SA ██████ informed PEREZ-RAMIREZ that SA ██████ was waiting for PEREZ-RAMIREZ at Walmart, which was located at 4140 West Greenfield Avenue, West Milwaukee. PEREZ-RAMIREZ then told SA ██████ he would meet SA ██████ in "like ten minutes."

245.    At approximately 2:02 P.M., SA ██████ arrived at Walmart and parked the UCV on the south side of the store in front of the outdoor Lawn & Garden area. At approximately 2:17 P.M., SA ██████ texted 414-517-5178 and asked when PEREZ-RAMIREZ would be arriving at Walmart. At approximately 2:22 P.M., SA received a response stating: "Be there in

62

4mins." At approximately 2:35 P.M., SA ██ called 414-517-5178 and spoke with PEREZ-RAMIREZ. PEREZ-RAMIREZ stated he was "pulling up."

246.     At approximately 2:40 P.M., investigators conducting surveillance at 1437 South 71st Street, West Allis, WI, observed a red Nissan 4 door with Wisconsin plate of AMW9537, **OBREGON's** registered vehicle, stop in front of 1437 South 71st Street. Investigators then observed a female, fitting the description of **OBREGON**, exit the automobile and enter the residence at 1437 South 71st Street. A short time later, the female exited the residence, walked up to the driver of the Nissan, and handed him an unknown item. Due to the distance between the Nissan and the surveillance personnel, investigators were only able to determine the driver was a Hispanic male. The Nissan then traveled north on 71st Street and the female re-entered the residence.

247.     At approximately 2:45 P.M., SA ██ texted 414-517-5178 and again asked when PEREZ-RAMIREZ would be arriving. SA ██ received a response at 2:47 P.M., stating, "Pulling up now." At approximately 2:49 P.M., SA ██ observed a red Nissan Altima bearing WI license plate "AMW9537", **OBREGON's** vehicle, pull into the Walmart parking lot from West Greenfield Avenue.

248.     Immediately after SA ██ observed the Nissan enter Walmart's parking lot, SA ██ received a text from 414-517-5178 stating "What car you in." Moments later, SA ██ received a call from PEREZ-RAMIREZ, who stated he had arrived at Walmart. The red Nissan then drove towards the UCV and parked approximately two parking rows east of the UCV. SA ██ then drove the UCV over to the red Nissan and observed PEREZ-RAMIREZ and an unknown male, who SA ██ later identified as UM #2 /"Zay Bay" through UM #2's voice, in the driver and front passenger seats, respectively. SA ██ then exited the UCV and

63

approached the red Nissan. As SA ▆▆▆ walked towards the car, PEREZ-RAMIREZ rolled down the driver's window and instructed SA ▆▆▆ to enter the rear-passenger seat.

249.    SA ▆▆▆ then walked around the back of the Nissan and entered the rear-passenger seat. As SA ▆▆▆ was in the process of entering the vehicle, SA ▆▆▆ observed UM #2 was a young black male, with short, braided hair, wearing a bright red hooded sweatshirt. Additionally, SA ▆▆▆ observed UM #2 had at least three cell phones on his lap (Figure 18 and 19). I know through training and experience that narcotics traffickers commonly utilize multiple cellular devices to facilitate their drug dealing. Additionally, SA ▆▆▆ observed a fourth cellular phone (iPhone), with the YouTube cellular application open, was mounted on the center of the vehicle's dash-board.



*(Figure 18)*
*UM #2 with three cellular phones on his lap/in hand.*

64



*(Figure 19)*
*Screenshot from recordings of UM #2 side profile*

250.     Upon entering the vehicle, PEREZ-RAMIREZ was leaned forward, handling items near his feet. Based on training, experience, and past controlled drug buys, SA ███ inferred PEREZ-RAMIREZ was weighing the crack cocaine to be purchased on a digital scale.

251.     SA ███ greeted the vehicle's occupants and PEREZ-RAMIREZ stated it was his birthday. SA ███ wished PEREZ-RAMIREZ a happy birthday and then asked PEREZ-RAMIREZ how much SA ███ owed PEREZ-RAMIREZ for the half-ounce of crack cocaine. PEREZ-RAMIREZ responded, "Nine", which based on my training and experience I understood to mean $900.

252.     SA ███ began counting $900 worth of ATF buy money and then thanked PEREZ-RAMIREZ for meeting SA ███ at Walmart, due to it being further west than GameStop, which is the location of previous narcotic transactions. PEREZ-RAMIREZ explained he did not mind, due to the "East Side" being "hot lately." I know from experience working in Milwaukee that the region between Doctor Martin Luther King Drive and Lake Michigan is

referred to as the "East Side."

253. At approximately 1:51 P.M., PEREZ-RAMIREZ sat upright and brought his hands into SA ████ view. At this time, SA ████ observed PEREZ-RAMIREZ hold a large plastic bag containing approximately two ounces of suspected crack cocaine (Figure 20).



*(Figure 20)*
*PEREZ-RAMIREZ holding a plastic bag containing approximately two ounces of suspected crack cocaine.*

254. SA ████ then asked PEREZ-RAMIREZ, between the two customer phones 414-517-5178 and 414-722-0553, which number SA ████ should contact to order narcotics. PEREZ-RAMIREZ stated SA ████ could call/text either number because, "All the phones are ours." In this context, Investigators understood this to mean both telephone numbers belonged to the ADTO.

255. SA ████ then asked PEREZ-RAMIREZ if PEREZ-RAMIREZ had obtained any firearms to sell to SA ████ PEREZ-RAMIREZ explained he was "trying to," but finding firearms was "hard" due to "no one trying to give it up." SA ████ subsequently asked if PEREZ-RAMIREZ knew individuals selling "switches." PEREZ-RAMIREZ responded, "Not from a motherfucker I can trust." I know from training and experience that "switches" is street vernacular for a device that is installed on Glock pistols that convert the semi-automatic pistol to

66

function as a machine gun.

256.    PEREZ-RAMIREZ then leaned back and handed SA ▮▮ a white chunky substance suspected to be crack cocaine that had been wrapped inside a knotted, clear plastic bag. After receiving the suspected crack cocaine from PEREZ-RAMIREZ, SA ▮▮ handed PEREZ-RAMIREZ $900 in ATF buy money and asked PEREZ-RAMIREZ to count the funds to ensure the amount was correct (Figure 21).



*(Figure 21)*

257.    SA ▮▮ then placed the suspected crack cocaine on his undercover digital scale to ensure the amount received from PEREZ-RAMIREZ was correct. SA ▮▮ scale displayed the substance weighed approximately 12.94 grams with packaging. SA ▮▮ informed PEREZ-RAMIREZ that the amount provided to SA ▮▮ was a gram short of the 14 grams SA ▮▮ had paid for. PEREZ-RAMIREZ initially exclaimed he did not believe SA ▮▮ was telling the truth; however, after SA ▮▮ showed the undercover scale to PEREZ-RAMIREZ, PEREZ-RAMIREZ acquiesced and broke off an additional amount of suspected crack cocaine from the approximately two ounces in the large plastic bag previously referenced. PEREZ-RAMIREZ then stated that he did not want to argue with SA ▮▮ because it was his birthday.

67

258.     After PEREZ-RAMIREZ had broken the additional amount of suspected crack cocaine off, PEREZ-RAMIREZ handed two small pieces of purported crack cocaine to SA ██████ SA ████ then placed the two small additional pieces on the undercover scale, which now registered a net weight of 14.20 grams (net weight = original 12.94 grams with packaging + additional two small pieces). SA ████ then stated they were "straight."

259.     PEREZ-RAMIREZ then informed SA ████ that PEREZ-RAMIREZ still intended to provide SA ████ with an additional "gram" of crack cocaine that was owed to SA ████ from a previous transaction. When SA ████ asked PEREZ-RAMIREZ to provide SA ████ with the additional gram at the present time, PEREZ-RAMIREZ stated, in substance, that PEREZ-RAMIREZ did not want to provide SA ████ with any additional crack cocaine without payment at that time. PEREZ-RAMIREZ explained he only wanted to sell the crack cocaine PEREZ-RAMIREZ currently possessed as opposed to settling a debt because it was PEREZ-RAMIREZ's birthday, and PEREZ-RAMIREZ wanted to earn as much money as PEREZ-RAMIREZ possibly could. SA ████ ultimately stated SA ████ would be fine receiving the crack cocaine still owed to him during a future transaction.

260.     At approximately 2:53 P.M., the cell phone mounted to the Nissan's dash began to ring UM #2 then answered the phone and stated, "Come down I'll be there in three minutes." SA ████ believed this phrase to be important due to the fact that during previous interactions SA ████ has had with WEDDLE and PEREZ-RAMIREZ, both individuals had instructed SA ████ to "come down" to purchase suspected crack cocaine from them. When UM #2 answered the incoming call at 2:53 P.M., SA ████ immediately recognized UM #2's distinct voice to be the same voice as an individual WEDDLE and MACK-HOWARD referred to as "Zay Bay" / UM #2 in the previously discussed recorded jail calls.

68

261.     At approximately 2:54 P.M., the cell phone mounted to the dash began to ring again. UM #2 again answered the phone and informed the caller that UM #2 would "be there in three minutes" (Figure 22). At approximately 2:55 P.M., the iPhone mounted on the dash received another call. UM #2 again answered the phone and informed the caller, "I'm getting off the highway right now I'll be there in three minutes."



*(Figure 22)*
*UM #2 picking up the mounted iPhone (which displays an incoming call)*

262.     At approximately 2:55 P.M., after SA ▮▮▮ informed PEREZ-RAMIREZ that SA ▮▮ was satisfied with the amount of purported crack cocaine provided to him by PEREZ-RAMIREZ, PEREZ-RAMIREZ placed the approximately two ounces of suspected crack cocaine in the center console of the vehicle.  At approximately 2:56 P.M., SA ▮▮▮ exited PEREZ-RAMIREZ's vehicle and thanked him for the transaction. SA ▮▮▮ then walked back and re-entered the UCV as PEREZ-RAMIREZ drove out of Walmart's parking lot.

263.     At approximately 2:59 P.M., SA ▮▮▮ exited Walmart's parking lot and traveled towards a pre-determined location as he was followed by a designated cover team. At approximately 3:06 P.M., SA ▮▮▮ terminated the recording equipment.  At approximately 3:20

69

P.M., SA ███ arrived at the post-operation location and the operation was concluded.

264. After the operation, SA ███ and I weighed and field-tested the suspected crack cocaine. The substance weighed approximately 14.18 grams with packaging and field-tested positive for crack cocaine.

265. On the same date, at approximately 9:00 P.M., Investigators drove past 1437 South 71st Street and observed **OBREGON's** Nissan parked in front of the residence. Investigators observed the Nissan was running due to the headlights and taillights of the vehicle being illuminated. Investigators then drove around the block to establish a position of fixed surveillance; however, when Investigators were able to observe the residence again, the Nissan had departed.

### S. Identification of Mobile Carriers for Target Cell Phones

266. On various dates over the course of this investigation, Investigators queried Target Cell Phones' numbers via Zetx.com. Zetx.com is a website offering mobile carrier identification to law enforcement officials. Zetx.com identified the following mobile carriers for the previously referenced target telephones:

  a. 414-722-0553: T-Mobile
  b. 414-517-5178: T-Mobile
  c. 414-627-7500: T-Mobile
  d. 414-839-8056: T-Mobile
  e. 414-690-4086: ATT Mobility

## IV. INFORMATION REGARDING APPLE ID AND iCLOUD[1]

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at

267.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

268.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

    a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

    c.  iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

    d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

---

https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

71

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

269. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

270. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

271. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including

72

the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

272.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

273.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC

73

address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

274. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

275. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the

74

files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

276. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

277. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

278. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

279.    Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

280.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## V.  INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

182.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## VI. CONCLUSION

183.    Based on the forgoing, I request that the Court issue the proposed search warrant.

184.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple.  Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**ATTACHMENT A**

**Property to Be Searched**

**Matter Number 2021R403**

This warrant applies to information associated with the Apple IDs and Apple iCloud accounts associated with the following information, that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, California 95014.

**Account 1:**
    Name: Marisela Obregon
    Date of Birth: 06/13/1993
    Phone: 414-690-4086
    Addresses:    3123 S Brisbane Ave, Milwaukee, WI 53207
                 3216 N Humboldt Blvd, Milwaukee, WI 53212
                 1437 S 71st Street, West Allis, WI 53214
    Email: MARISELA.OBREGON@ICLOUD.COM

78

**ATTACHMENT B**

**Particular Things to be Seized**

**Matter Number 2021R403**

**I.      Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the accounts (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),

Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.       The contents of all emails associated with the accounts **from January 14, 2021 to present day** including stored or preserved copies of emails sent to and from the accounts (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.       The contents of all instant messages associated with the accounts **from January 14, 2021 to present day**, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the accounts (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.       The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud

Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

      f.     All activity, connection, and transactional logs for the accounts (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

      g.     All records and information regarding locations where the accounts or devices associated with the accounts were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

      h.     All records pertaining to the types of service used;

      i.     All records pertaining to communications between Apple and any person regarding the accounts, including contacts with support services and records of actions taken; and

      j.     All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

81

The Provider is hereby ordered to disclose the above information to the government within fourteen days of service of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence and/or instrumentalities of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances and maintaining a drug-involved premises, violations of Title 21, United States Code, Sections 841, 846 and 856 and possession of a firearm in furtherance of drug trafficking, violation of Title 18, United States Code Sections 924(c), have been committed by **Marisela OBREGON** and other identified and unidentified subjects from January 14, 2021 to present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. any information relating to OBREGON's possession or purchase of firearms and controlled substances;

b. lists of customers and related identifying information;

c. information related to types, amounts, and prices of firearm and drugs trafficked as well as dates, places, and amounts of specific transactions;

d. any information related to sources of firearms and drugs (including names, addresses, phone numbers, or any other identifying information);

e. communications related to drug and firearm trafficking, including electronic communications such as text and instant message;

f. any information recording OBREGON's schedule or travel;

g. all bank records, checks, credit card bills, account information, and other financial records;

h. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

i. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

j. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

k. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

82

l.	Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, ATF may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.